# Illinois Official Reports

## Appellate Court

---

### *People v. Viramontes*, 2017 IL App (1st) 160984

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LUIS VIRAMONTES, Defendant-Appellant. |
| District & No. | First District, Second Division<br>Docket No. 1-16-0984 |
| Filed | September 26, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CR-5564; the Hon. Timothy J. Joyce, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Douglas H. Johnson and Nicholas M. Curran, of Kathleen T. Zellner & Associates, of Downers Grove, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Miles J. Keleher, and Lisanne P. Pugliese, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Presiding Justice Neville and Justice Mason concurred in the judgment and opinion. |

**OPINION**

¶ 1 After discovering that his wife was having an affair with a former coworker, Luis Viramontes brutally beat her, and she later died from her injuries. At trial, Luis admitted he caused the injuries that led to his wife's death, but claimed he was seriously provoked by her infidelity and that she willingly engaged in aggression against him. A jury convicted Luis of first degree murder, and the trial court sentenced him to 25 years in prison.

¶ 2 Luis appealed his conviction, arguing the trial court (i) should have given a second degree murder instruction because the suggestive text messages and photographs equate to personal discovery of the adulterous act itself and warrant a provocation instruction; (ii) should have granted his request for instructions on involuntary manslaughter, aggravated battery, and domestic battery; (iii) should not have allowed the jury to view two autopsy photographs of his wife's head injuries, which he claimed were unduly prejudicial and inflammatory; and (iv) improperly limited his cross-examination of State witness Liliana Almazan, which might have revealed bias or motive to lie. The appellate court rejected all of these arguments and affirmed the conviction and sentence. *People v. Viramontes*, 2014 IL App (1st) 130075.

¶ 3 Through private counsel, Luis filed a postconviction petition contending: (i) he was denied effective assistance of trial counsel because his trial attorney failed to consult with or call an expert witness to rebut the State's medical evidence, (ii) his trial counsel was ineffective for failing to make a proper offer of proof to admit impeachment evidence against Liliana Almazan, (iii) the trial court's refusal to issue an involuntary manslaughter instruction violated his rights to due process and a jury trial, (iv) he was denied his right to a fair trial because the trial court admitted into evidence irrelevant and prejudicial text messages between him and his wife, (v) his appellate counsel was ineffective for failing to properly argue that the trial court's refusal to give an involuntary manslaughter instruction violated his rights to due process, and (vi) his appellate counsel was ineffective for failing to raise the improper text message testimony on appeal.

¶ 4 The trial court summarily dismissed Luis's petition finding that all issues raised were frivolous and patently without merit or barred by *res judicata*. We agree and affirm.

¶ 5 BACKGROUND

¶ 6 At trial, Luis testified that on January 9, 2010, he and his wife, Sandra Rincon-Viramontes, went out for dinner and drinks with family and friends to celebrate his birthday. Sandra's mother watched their two children overnight. The party ended around 11 p.m. Luis testified that on the drive home, he noticed Sandra received a text message, which he thought was strange. Sandra fell asleep in the car, and when they arrived home, Luis carried her inside and put her to bed. When he returned to the car for their belongings, he checked Sandra's phone and saw a sexually explicit text message exchange between Sandra and "Denise."

¶ 7 Luis testified that, unknown to him at the time, Sandra was having an extramarital affair with Andres (Andy) Ochoa, a former coworker. Sandra saved Andy's phone number in her cell phone as "Denise." On January 9, Sandra and Andy exchanged 18 text messages. Their conversation mentioned meeting up and a request from Andy for suggestive photographs. In reply, Sandra sent four or five naked pictures of herself.

¶ 8    Luis testified that when he saw the messages and photographs, he "felt like [his] whole life was turned upside down." He tried calling Denise's number to discover who Sandra had been texting, but no one answered. Luis testified that when he saw the text from Denise stating "you're making me hard," he knew it was from a man and that Sandra was having an affair.

¶ 9    Luis testified he then went into the house to confront Sandra about the affair. He found her in the bathroom snorting cocaine, and they argued about the drugs. The argument continued into the living room, where Luis confronted Sandra about the text messages and naked photos. Sandra asked for her phone back. Luis tried again to call Denise's number. Sandra told Luis that "Denise" was really Andy, she had been intimate with him, and they were in love.

¶ 10    Luis testified he was "angry" and "devastated." He hit Sandra in the face with an open hand. Sandra ran into the bedroom and locked the door. Luis continued to yell at Sandra, calling her vulgar names and reading the text messages aloud. Luis then spray painted the living room and hallway walls and their wedding pictures with explicit words related to the affair. He sat at the kitchen table, put his head down, and cried.

¶ 11    Sandra came out of the bedroom. When she saw the spray-painted walls, she ran toward Luis screaming and swinging at him. She began to hit him in the chest, so he grabbed Sandra's shoulders, "threw her against the door, and then tossed her over the table." Luis told Sandra he was leaving her. She got up and ran at him again. Luis grabbed her by the shoulders and threw her against the refrigerator and then onto the kitchen floor, telling her "Get off me. Leave me. I'm leaving you. I'm not going to be with you no more." He then walked toward the back door.

¶ 12    Sandra got up from the floor, threw her wedding rings at Luis, and said she did not want to be married. Luis testified that Sandra then told him that she had an abortion and killed his baby. Luis said he thought he had facilitated the abortion because he drove her to a doctor's appointment he thought was related to her cancer diagnosis. Luis testified he "lost it" and "couldn't control [himself] after that." Luis grabbed Sandra and threw her into the refrigerator, causing her to hit her head hard. He then threw her onto the floor, where she hit her head again. On the floor in the fetal position, Sandra tried to cover herself as Luis hit her in the face with his hands four or five times.

¶ 13    Luis testified that although he hit and threw Sandra, he was not trying to kill her. He said he was close to potential weapons, including knives, but did not use any because, as he put it, "I wasn't trying to kill her." Luis went outside to calm down and texted "Denise," who did not respond. Around 2:30 a.m., he called his brother, Fernando, and asked him to come over.

¶ 14    When Luis went back in the house, Sandra was in bed. He went over to her and asked if she was alright. She responded, "Babe, I'm sorry," to which he replied he was sorry too. Luis testified Sandra told him to lie next to her and he did. He claimed she hugged him and told him she loved him. Luis testified he tried to comfort her and then she went to sleep.

¶ 15    Luis's brother, Fernando, testified he arrived at the house shortly after 3 a.m. He looked in the bedroom and saw Sandra. He said she did not look hurt, and he thought she was sleeping off her intoxication. He did not notice her breathing unusually and did not believe she needed medical attention. When he asked Luis what happened, Luis seemed confused and repeated the same phrase over and over, "I trusted her, I trusted her." Luis told Fernando he had hit Sandra with his hands. Fernando testified he suggested Luis lay down with Sandra and comfort her. Fernando slept in a separate bedroom.

¶ 16    Luis woke Fernando around 7:30 a.m. and told him that Sandra was breathing differently. Fernando ran to the bedroom. Sandra's breathing was heavy; she mumbled and moaned. He noticed redness on her face, shoulders, and chest. And, he saw blood on the mirror and bed sheet. Fernando again asked Luis what happened. Luis told him to call an ambulance, which Fernando did. According to Fernando, Luis was "very nervous, shocked, [and] confused" and in a state he had never seen his brother. Luis left the house at his instruction, but called "countless times" throughout the day to check on Sandra.

¶ 17    Sandra was taken to the hospital by ambulance. In the emergency room, she was unable to communicate. Photographs were taken of her injuries and extensive bruising. She had no fractures or injuries to her internal organs, other than her brain. Toxicology reports were positive for cocaine. Sandra was put on life support. She remained in a coma until her family had her ventilator removed when they were informed she would not recover. Sandra died on January 31, 2010. Luis turned himself in to the police on January 13.

¶ 18    When asked by his attorney on direct examination if he and Sandra ever exchanged "sexy pictures" via text message Luis said no. On cross-examination, the State asked Luis about texts of a sexual nature that he exchanged with his wife and specifically asked about text messages sent between January 5 and 9, 2010. Defense counsel's objections based on marital privilege were overruled. Luis responded that he could not recall sending and receiving most of the messages. Luis admitted sending Sandra text messages on the night he beat her asking, "Do you have a problem with me?"

¶ 19    On re-direct, Luis's attorney asked him about additional text messages Luis sent to Sandra in the days before the beating, telling her that he loved her. The parties then stipulated that all of the text messages referred to during direct and cross-examination were exchanges between Luis and Sandra.

¶ 20    Before trial, the State argued a motion *in limine*, asking the court to allow testimony from two witnesses who said they saw Luis hit Sandra on other occasions and saw her with black eyes. The motion was denied with regard to the testimony about black eyes but was granted to allow the witnesses to testify about seeing Luis hit Sandra for the limited purposes of showing intent. At trial, the State presented only one of the witnesses, Liliana Almazan. Liliana had a child with Sandra's brother. She said she knew Sandra for 11 years and considered her a "sister." A year before Luis and Sandra married, Almazan attended a party at their home and was sitting in front of the house with Sandra when Luis walked down the stairs and "slapped her upside the head." She testified that Luis did not say anything to Sandra but he looked upset.

¶ 21    Before Almazan testified, defense counsel sought to introduce photographs during cross-examination showing injuries Luis's niece, Crystal Viramontes, sustained during a fight with Almazan in June 2010. The State acknowledged Almazan had a misdemeanor battery conviction related to the fight but objected to it being raised on cross-examination. Defense counsel said he planned to raise only the fight not the conviction during cross-examination. Crystal was on the State's witness list but the State told the trial court they would not be calling her. When asked about the relevance of the fight, defense counsel said, "It goes to show her motives to lie. The fact that she's engaging in the battery of a member of the defendant's family. You have to understand the context of this. Liliana has a child with the brother of the alleged victim in this matter and both sides have been very hostile toward one another. This will go right to her motive and bias to lie." The court prohibited the defense from cross-examining Liliana about the fight but allowed defense counsel to make it part of the

record. Defense counsel submitted four photos of Crystal Viramontes as she appeared after the fight with Almazan for the record.

¶ 22 The State presented two expert witnesses. Dr. David McElmeel, the hospital trauma and surgical critical care attending physician, testified that when Sandra was admitted, he saw multiple bruises on Sandra's body, decreased consciousness, and severe edema or swelling of the brain. He found bilateral subdural hematomas (an accumulation of blood on the brain's surface) from blunt head trauma; bruising around her forehead, eyes, nose, arms, shoulders, chest area, hands, and hip; and lacerations on the bridge of her nose, her forehead, and right ankle. Dr. McElmeel explained Sandra suffered significant trauma and that severe force had to be applied to cause her injuries. Regarding the toxicology screen testing positive for cocaine, McElmeel testified cocaine did not contribute to or cause Sandra's death.

¶ 23 During cross-examination by defense counsel, Dr. McElmeel acknowledged that Sandra's urine toxicology screen was positive for a high level of cocaine. She had high blood pressure when she arrived at the hospital, and he agreed that the high blood pressure could be related to cocaine toxicity or could also be related to her head injury. Dr. McElmeel said Sandra had no trauma to her neck; no internal injuries to her chest, abdomen, or back; and no facial or skull fractures. She had lacerations on her nose and forehead, but nowhere else on her head.

¶ 24 Dr. Michael Humilier performed Sandra's autopsy. He testified that Sandra was 30 years old and weighed 91 pounds (the parties stipulated she weighed 104 pounds when she entered the hospital). He noted 27 external evidences of injury and extensive bruising covering almost every body surface. He found a subdural hemorrhage, a collection of blood under the skull between the layers of tissue that surround the brain, and cerebral edema, swelling of the brain. Dr. Humilier testified that the force had to be significant to inflict the devastating injuries, something appreciably more severe than banging her head against the wall. In Humilier's opinion, the cause of death was bronchopneumonia due to blunt force trauma from the assault. He ruled the death a homicide. He also testified that a drug overdose did not contribute to or cause Sandra's death.

¶ 25 During cross-examination by defense counsel, Dr. Humilier agreed that cocaine can cause cerebral edema (which he found in Sandra's head), subarachnoid hemorrhage (which he did not find), as well as respiratory problems, elevated blood pressure, and convulsions. He confirmed that (i) hospital records showed Sandra had cocaine in her system when she was admitted and (ii) he could not determine whether the bruising on Sandra's body, aside from the injuries to her head, happened during the fight with Luis or at the hospital. Dr. Humilier acknowledged that he did not find any fractured bones or any injuries to Sandra's internal organs.

¶ 26 At the jury instruction conference, the defense tendered 18 jury instructions, including a lesser-included instruction for second degree murder based on provocation. The defense argued sufficient evidence existed for provocation based on adultery and mutual combat. The State responded that the case did not fit into any of the four categories meriting a second degree instruction. The court agreed. The defense also sought instructions on involuntary manslaughter, domestic battery, and aggravated battery. The court denied these as well.

¶ 27 The jury convicted Luis of first degree murder. The trial court sentenced Luis to 25 years in prison. The posttrial motion for a new trial was denied. Luis appealed, arguing that the trial court (i) should have given a second degree murder instruction as the suggestive text messages and photographs equate to personal discovery of the adulterous act itself and warrant a

provocation instruction; (ii) should have granted his request for instructions on involuntary manslaughter, aggravated battery, and domestic battery; (iii) should not have allowed the jury to view two autopsy photographs of his wife's head injuries, which he claimed were unduly prejudicial and inflammatory; and (iv) improperly limited his cross-examination of State witness Liliana Almazan, which might have revealed bias or motive to lie. The appellate court affirmed the conviction and sentence. *Viramontes*, 2014 IL App (1st) 130075.

¶ 28    In his postconviction petition, which was filed on December 21, 2015, through private counsel, Luis alleged (i) he was denied effective assistance of trial counsel because his trial attorney failed to consult with or call an expert witness to rebut the State's medical evidence, (ii) his trial counsel was ineffective for failing to make a proper offer of proof that would have persuaded the trial court to allow Crystal Viramontes to testify and impeach Almazan's testimony, (iii) the trial court's refusal to issue an involuntary manslaughter instruction violated his rights to due process and a jury trial, (iv) he was denied his right to a fair trial because the trial court admitted into evidence irrelevant and prejudicial text messages between him and his wife, (v) his appellate counsel was ineffective for failing to argue the trial court erred by admitting Luis's text message testimony, and (vi) his appellate counsel was ineffective by failing to properly argue that the trial court's refusal to give an involuntary manslaughter instruction violated his rights to due process.

¶ 29    Luis attached two affidavits to his postconviction petition. First, Dr. Larry Blum, a board certified forensic pathologist, averred that after reviewing the trial testimony, Sandra's medical records, the postmortem report, and autopsy photographs, he concluded that Dr. Humilier's testimony that it would take a "relatively significant force" to inflict the injuries seen in Sandra's brain was "not necessarily true." He asserted that cerebral edema, or brain swelling, can be associated with even mild brain injury and that the amount of cerebral edema found in a patient at the time of death is not necessarily proportional to the blunt force used to inflict the initial injury. He also stated that cocaine can contribute to cerebral edema.

¶ 30    Dr. Blum opined that the bruising to Sandra's face and body did not contribute in any significant way to her death and that it is difficult to assess the amount of force used because bruising varies significantly between individuals based on a number of factors. Dr. Blum noted that Sandra had Hodgkin's lymphoma and that complications from lymphoma or treatment for lymphoma can increase bleeding and bruising. He stated that the volume of blood in Sandra's hematoma, as described by Dr. Humilier, was relatively small and would not necessarily be lethal. Also, the existence of a subdural hematoma in the brain is not necessarily indicative of an injury from a "significant force."

¶ 31    Dr. Blum stated that although Dr. Humilier and Dr. McElmeel used the term "significant force," the evidence did not show that Sandra sustained scalp lacerations, skull fractures, or other injuries typically seen with blunt force trauma. Moreover, Sandra was responsive immediately after the beating and did not have fractures, which "strongly suggests that her initial injury, although clinically significant, could have been caused by something less than 'significant' blunt force." Dr. Blum concluded that her injuries were not severe enough to infer that Luis intended to either kill her or cause her death.

¶ 32    Luis also attached the affidavit of Crystal Viramontes, his niece. Crystal averred that she was close to Sandra and never saw Luis act violently toward her. She said she knew Liliana Almazan through Sandra and that after Luis was charged with Sandra's murder, Almazan attacked her twice and she believed Almazan was prosecuted and spent time in jail for both

attacks. During the attacks, Almazan told her she was "going to make [Luis] and me pay dearly for what Luis did to Sandra." Crystal never spoke to Luis's attorney but before trial, she told Luis about the attacks and thought he would inform his attorney about them. During trial she was told she might be called to testify but she was not.

¶ 33 On March 3, 2016, the trial court issued a written order finding all issues raised by Luis's petition to be "frivolous and patently without merit or barred by *res judicata*" and summarily dismissed the petition. As to Luis's claim of ineffective assistance of trial counsel for failing to call an expert to refute the State's experts, the trial court found it waived for not be raised on direct appeal and meritless because "Dr. Blum's testimony *** amounts to nothing more than second-guessing counsel's performance, which *Strickland* strongly cautions the court to avoid." "Rather than call an expert, counsel made a strategic decision to engage in adversarial testing of the State's expert testimony by extensively cross-examining the witnesses." After noting the information elicited on cross-examination—including information about the effects cocaine may have had on Sandra, alternative explanations for her bruising, and the absence of any fractures—the trial court concluded "counsel's decision to challenge the medical evidence through cross-examination and closing argument fell within the wide range of reasonable professional conduct." The court further stated, even if "an expert witness would have inherently made the defense's case stronger, the decision not to call an expert is not *per se* ineffective assistance because the State could always call additional experts to offer contrasting opinions."

¶ 34 Luis claimed he was prejudiced by his attorney's failure to call an expert witness because it not only prevented his possible acquittal but deprived him of an involuntary manslaughter instruction. The court rejected this argument, finding that the decision whether to give an involuntary manslaughter instruction was based on factors other than the medical testimony regarding Sandra's injuries, including the physical disparity between Luis and his wife, so the introduction of that testimony would not have necessarily resulted in the requested jury instruction. Further, Luis failed to show that had the jury instruction been given, the jury would have found him guilty of involuntary manslaughter instead. And he cannot demonstrate an arguable likelihood that the jury would have felt obligated to disregard the State's medical experts and other evidence and would have found him not guilty.

¶ 35 As to Luis's claim that he received ineffective assistance because his trial counsel did not make a proper offer of proof, the trial court also found this argument waived, because it was not raised on direct appeal, and meritless, because it amounted to "an erroneous attempt to second-guess counsel's performance through the distorting lens of hindsight." The court stated that the offer of proof was a matter of "trial strategy" and even if counsel's strategic decision demonstrated deficient performance, "petitioner fails to establish that the alternative offer of proof advanced in the petition would have had any greater likelihood of success or that introduction of the desired impeachment testimony would have resulted in an entirely different outcome at trial."

¶ 36 Regarding the alleged trial court errors, the court found Luis's claim of error for failing to issue a jury instruction for involuntary manslaughter was barred by *res judicata* as it had been raised and affirmed on direct appeal.

¶ 37 The trial court found Luis's testimony on cross-examination about his text messages with Sandra properly admitted because defense counsel opened the door by asking Luis whether he had exchanged text messages of a sexual nature with Sandra and, as a matter that affects

witness credibility, it was a proper subject of cross-examination. The trial court also found that Luis did not demonstrate that he was prejudiced by the testimony; he failed to show the testimony was a material factor in his conviction in light of the trial evidence.

¶ 38        Lastly, as to Luis's argument that his appellate counsel was ineffective by failing to sufficiently raise the trial court's refusal to submit a manslaughter instruction, Luis contended that if his attorney had raised this argument on federal rather than state law grounds, the appellate court would have applied a *de novo* rather than an abuse of discretion standard of review. But the trial court found no cases supporting his position. Luis also failed to demonstrate deficient performance as his appellate attorney made a strategic decision about which arguments to press. And Luis failed to prove he was prejudiced because, based on the evidence, he cannot show that if the appellate court had applied a *de novo* standard of review, there would have been a different outcome. The trial court also rejected, on the basis that the underlying claim was meritless, Luis's claim that his appellate counsel was ineffective for failing to raise the text message testimony.

¶ 39                                    ANALYSIS

¶ 40        The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2014)) provides a process for a convicted defendant to assert a substantial denial of his or her constitutional rights in the proceedings that led to the conviction. *People v. Harris*, 224 Ill. 2d 115, 124 (2007). A proceeding under the Act does not constitute a continuation of the criminal case or substitute for direct appeal. Rather, it serves as a collateral proceeding that is limited to claims that were not, but could have been, litigated earlier. *People v. Petrenko*, 237 Ill. 2d 490, 499 (2010). "Consequently, any issues that were decided on direct appeal are *res judicata*, and any issues that could have been presented on direct appeal, but were not, are forfeited." *People v. Reyes*, 369 Ill. App. 3d 1, 12 (2006). A defendant bears the burden of showing that he qualifies for relief under the Act by demonstrating a violation of a constitutional right. 725 ILCS 5/122-1(a)(1) (West 2014).

¶ 41        A postconviction proceeding has three distinct stages. *People v. Boclair*, 202 Ill. 2d 89, 99 (2002). At the first stage, the trial court must determine whether the defendant's petition is "frivolous" or "patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2014). A petition is considered "frivolous" or "patently without merit" when it has "no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). A petition will have "no arguable basis either in law or in fact" when it "is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* Where the record contradicts a defendant's legal theory, the theory is meritless. *Id.* "Fanciful factual allegations include those which are fantastic or delusional." *Id.* at 17. The petition will be dismissed only if it is frivolous or patently without merit. 725 ILCS 5/122-2.1(a)(2) (West 2014).

¶ 42        The trial court should not dismiss a petition at the first stage if sufficient facts are alleged "to state the gist of a constitutional claim." *People v. Allen*, 2015 IL 113135, ¶ 24. All well-pled facts in the petition and supporting affidavits are taken as true. *People v. Pitsonbarger*, 205 Ill. 2d 444, 455 (2002). We review a first-stage dismissal *de novo*. *Allen*, 2015 IL 113135, ¶ 19.

¶ 43                    Ineffective Assistance of Trial Counsel

¶ 44    Luis contends his trial counsel should have (i) investigated and presented an expert witness on the issue of the force necessary to cause Sandra's injuries and the effects of cocaine on her system and (ii) made a sufficient offer of proof to admit impeachment evidence against Liliana Almazan.

¶ 45    In determining whether a defendant was denied his or her right to effective assistance of counsel, we apply the two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984); *People v. Colon*, 225 Ill. 2d 125, 135 (2007) (citing *People v. Albanese*, 104 Ill. 2d 504 (1984) (adopting *Strickland*)). Under *Strickland*, a defendant must prove (1) his or her attorney's actions constituted errors so serious as to fall below an objective standard of reasonableness and, (2) absent those errors, there was a reasonable probability that the trial's outcome would have been otherwise. *People v. Ward*, 371 Ill. App. 3d 382, 434 (2007) (citing *Strickland*, 466 U.S. at 687-94). To prevail, the defendant must satisfy both prongs of the *Strickland* test. *Colon*, 225 Ill. 2d at 135. "That is, if an ineffective-assistance claim can be disposed of because the defendant suffered no prejudice, we need not determine whether counsel's performance was deficient." *People v. Graham*, 206 Ill. 2d 465, 476 (2003).

¶ 46    Combining the standard for a first-stage summary dismissal with the standard for ineffective assistance of counsel, our supreme court has held that a postconviction petition alleging ineffective assistance of counsel may not be summarily dismissed, if: "(i) it is arguable that counsel's performance fell below an objective standard of reasonableness and (ii) it is arguable that defendant was prejudiced." *Petrenko*, 237 Ill. 2d at 497 (citing *People v. Golden*, 229 Ill. 2d 277, 283 (2008)).

¶ 47                      Failure to Call an Expert Witness

¶ 48    Luis contends his trial counsel was ineffective for failing to investigate or call an expert witness to testify about the amount of force necessary to cause Sandra's injuries. Luis asserts that the degree of force necessary to cause Sandra's injuries was determinative of whether he had the requisite knowledge or intent for a first-degree murder conviction. The State presented two medical experts, Dr. Humilier and Dr. McElmeel, who testified that Sandra's injuries were the result of "relatively significant force" and a "severe amount of force," and so Luis must have known his action was likely to result in death or serious bodily injury. Luis claims, however, he only hit Sandra four or five times with his open hand and pushed her into a refrigerator and a table and did nothing showing he knew she would likely suffer that degree of harm. He further asserts that Sandra's injuries were exacerbated by heavy cocaine use and that his attorney should have called an expert, like Dr. Blum, to testify as to the scientific validity of the State's arguments or contradict the State's experts. He also contends the failure to call an expert to rebut the medical testimony precluded his requested involuntary manslaughter instruction.

¶ 49    For support, Luis relies on *People v. Domagala*, 2013 IL 113688, and *People v. Tate*, 2012 IL 112214. In *Tate*, the Illinois Supreme Court reversed the summary dismissal of a postconviction petition, finding it was arguable that the defendant was prejudiced by his attorney's failure to investigate or call four witnesses, two of whom could have provided the defendant with an alibi defense. *Tate*, 2012 IL 112214, ¶¶ 24-25. One witness would have testified (i) he was five feet from the victim at the time of the shooting, (ii) he saw the shooting, (iii) he had known defendant for years, and (iv) he was "sure" that the defendant was not the

shooter. *Id.* ¶ 5. No physical evidence linked the defendant to the crime and the defendant did not make a confession. *Id.* ¶ 24. Hence, the witness's testimony would have provided a first-person account of the incident that directly contradicted the State's eyewitness testimony. *Id.*

¶ 50   Luis notes that in *Tate*, the supreme court rejected the State's argument that trial counsel had strategic reasons for not calling certain witnesses because their testimony would have hurt defendant rather than helped him. The supreme court stated that the State's "argument is more appropriate to the second stage of postconviction proceedings, where both parties are represented by counsel, and where the petitioner's burden is to make a substantial showing of a constitutional violation. The State's strategy argument is inappropriate for the first stage, where the test is whether it is arguable that counsel's performance fell below an objective standard of reasonableness and whether it is arguable the defendant was prejudiced." *Id.* ¶ 22.

¶ 51   Luis asserts that as in *Tate*, as a first-stage proceeding, we should reject the State's argument that his attorney had strategic reasons not to present an expert witness. But his reliance on *Tate* is misplaced. While *Tate* did hold that the strategy argument is not appropriate for the first stage, unlike in *Tate*, Dr. Blum's affidavit does not meet the "arguable" *Strickland* standard. In *Tate*, as the supreme court noted, the affidavits of the witnesses who were not called at trial averred that they were present when the shooting happened, with one witness stating he was five feet from the victim, knew the defendant, and was "sure" he was not the shooter. Conversely, neither Dr. Blum nor any other expert witness could have unequivocally testified that Luis did not commit the crime.

¶ 52   Moreover, unlike in *Tate*, Luis's attorney cross-examined the State's expert witnesses on most of the issues Dr. Blum discusses. On cross-examination, the State's experts acknowledged that Sandra did not have broken bones; that she tested positive for cocaine, which can cause cerebral edema; and that her bruising may have been caused by her cancer diagnosis. And during closing argument, defense counsel relied on the testimony he elicited during his cross-examination of the State's experts to argue, in part, that Sandra had not been severely beaten but had signs of cocaine toxicity, which caused her death. Thus, the defense counsel did present an alternate theory to the jury, namely, that Sandra was not severely beaten and that cocaine significantly contributed to her death. The jury opted not to accept that theory and Luis, with the benefit of hindsight, wants to argue that the jury might have decided otherwise if his attorney had presented and expert witness. But, as the trial court noted, "Dr. Blum's testimony *** amounts to nothing more than second-guessing counsel's performance, which *Strickland* strongly cautions the court to avoid."

¶ 53   In addition to failing to establish that his attorney's performance was deficient, Luis fails to show prejudice in light of the overwhelming evidence against him, including his own admissions. Luis argues that the lack of expert testimony, which could have shown that something other than his beating Sandra caused her death, prevented him from receiving an involuntary manslaughter instruction and an acquittal. This claim is based on speculation and cannot support a claim for ineffective assistance of counsel. *People v. Gosier*, 165 Ill. 2d 16, 24 (1995). First, as the trial court noted, its decision regarding the involuntary manslaughter instruction was "not rooted solely in the State's medical testimony regarding the nature of the victim's injuries but was also based on other factors such as the disparity between petitioner and victim." Thus, we cannot say it is arguable that introduction of an expert witness would have changed the trial court's mind about giving the involuntary manslaughter instruction.

¶ 54    In addition, the evidence of Luis's guilt, including his own testimony was overwhelming and thus, he cannot establish that it is arguable the outcome of the trial would have been different if his attorney had presented expert medical testimony. Luis testified as to the severity of the beating, stating that he threw Sandra against a door, over the table, and into the refrigerator, causing her to hit her head against the refrigerator, "really hard." He then threw her onto the floor, where she hit her head again. On the floor in the fetal position, Sandra tried to cover herself as Luis hit her in the face with his hands four or five times.

¶ 55    With respect to his counsel's alleged failure to investigate whether to present an expert witness, Luis asserts his attorney had an obligation to investigate his case and explore all readily available sources of evidence that could have benefited him. He argues that his attorney could not be deemed to have made the decision on an expert witness based on valid trial strategy when his attorney did not even investigate the possibility or determine the substance of a potential expert witness.

¶ 56    It is well settled that trial counsel has a professional duty to conduct reasonable investigations and independently investigate any possible defenses. *Strickland*, 466 U.S. at 691. Further, "[l]ack of investigation is to be judged against a standard of reasonableness given all of the circumstances, 'applying a heavy measure of deference to counsel's judgments.' " *People v. Kokoraleis*, 159 Ill. 2d 325, 330 (1994) (quoting *Strickland*, 466 U.S. at 691). Defense counsel's cross-examination of the expert witnesses regarding the types of injuries Sandra suffered and the possible effects of cocaine in exacerbating those injuries show that defense counsel engaged in reasonable investigation of Luis's case and possible defenses. His decision to elicit the testimony on cross-examination of the State's experts did not constitute ineffective assistance of counsel.

¶ 57                                    Offer of Proof

¶ 58    Luis contends the trial court should not have summarily dismissed his claim that his trial counsel was ineffective by failing to make a sufficient offer of proof to admit impeachment evidence against Liliana Almazan, who testified for the State that she saw Luis hit Sandra on the head. Luis argues that his attorney failed to adequately make a proffer to allow evidence showing that Almazan committed a battery against his niece, Crystal Viramontes, several months after Sandra died, which would have shown that Almazan was biased against him. Luis submitted Crystal's affidavit providing extensive details of the fight and averring that Almazan told Crystal that she would "make Luis and me pay dearly for what Luis did to Sandra" and that she was "going to make sure that Luis went back to jail."

¶ 59    A postconviction proceeding is not a substitute for a direct appeal, but instead, is a collateral attack on the conviction that allows only limited review of constitutional claims that could not be raised on direct appeal. *People v. Harris*, 224 Ill. 2d 115, 124 (2007). Therefore, claims that could have been raised on direct appeal, but were not, are forfeited, and claims that were addressed on direct appeal are barred by *res judicata*. *Id.* at 124-25; 725 ILCS 5/122-3 (West 2014); see also *People v. Makiel*, 358 Ill. App. 3d 102, 105 (2005) (any issues decided on direct appeal are barred by *res judicata*; any issues that could have been raised on direct appeal are defaulted). This rule is relaxed where "the facts relating to the claim do not appear on the face of the original appellate record." *Makiel*, 358 Ill. App. 3d at 105. Forfeiture is not implicated, however, when a claimant relies on evidence outside the original appellate record. *People v. Enis*, 194 Ill. 2d 361, 375-76 (2000).

¶ 60      On direct appeal, Luis alleged the trial court improperly precluded him from cross-examining Almazan about the misdemeanor battery conviction (*Viramontes*, 2014 IL App (1st) 130075, ¶¶ 87-92). At that time, he also could have raised the argument that his trial counsel was ineffective for not offering a sufficient proffer. Thus, his argument that his attorney was ineffective for failing to make a sufficient proffer was forfeited.

¶ 61      Even if the alleged failure to proffer was not forfeited, Luis cannot establish it constitutes an arguable claim of ineffective assistance of counsel because Luis's attorney made a sufficient offer of proof. First, although Luis's brief suggests Crystal would have testified and impeached Liliana Almazan's testimony, the record shows defense counsel did not seek to call Crystal as a witness but wanted to use Almazan's battery conviction on cross-examination to impeach her for bias. Defense counsel informed the court of the nature of the battery Almazan committed against Crystal and the reason why he wanted to introduce it on cross-examination. When the trial court questioned the relevance of the fight, trial counsel said that Almazan had a child with the victim's brother, that "both families have been very hostile to one another," and that the evidence "will go right to her motive and bias to lie." He also informed the trial court that the fight occurred in June 2010, within a few months of Sandra's death. When the trial court precluded the questioning, defense counsel asked that photos depicting Crystal after the fight be made part of the record and impounded for the appellate court. Although Crystal's affidavit perhaps provides a more vivid description of both the fight and Almazan's comments to Crystal, it does not add more information than was offered in the proffer as to the testimony's purpose—to show that Almazan as biased against Luis. Although the trial court denied defense counsel's request, as noted, we will not second guess counsel's performance through the distorting lens of hindsight. See *People v. Rodriguez*, 364 Ill. App. 3d 304, 312 (2006) ("For purposes of *Strickland*'s first prong, it is not enough that another lawyer, with the benefit of hindsight, would have acted differently than trial counsel.").

¶ 62                          Involuntary Manslaughter Jury Instruction

¶ 63      Luis next contends summary dismissal of his petition was not warranted because the trial court denied him the right to a fair trial by refusing to grant his request for a jury instruction on involuntary manslaughter. Luis asserts the facts at trial showed he did not intend to kill Sandra and supported giving an involuntary manslaughter instruction. Specifically, he notes the evidence showed that the fight was over Sandra's sexual infidelity, Sandra did not suffer any broken bones, Sandra hit him back, Luis did not use weapons that were available to him, Sandra was not unresponsive until hours after the fight, and Luis asked his brother to call 911. Relying on *Beck v. Alabama*, 447 U.S. 625 (1980), Luis argues that the trial court's refusal to consider a lesser included offense where the evidence supported it is a denial of due process.

¶ 64      The State counters that, because the appellate court addressed this specific claim in Luis's direct appeal, the claim was waived and barred by *res judicata*. The State acknowledges that Luis did not raise a due process argument on direct appeal and instead argued that the evidence supported an involuntary manslaughter instruction because the jury could have rationally found he acted recklessly and not with the intent to kill Sandra. The State argues, however, that Luis cannot obtain relief under the Act by rephrasing previously addressed issues in constitutional terms in a postconviction petition.

¶ 65      We agree with the State. Although the purpose of the postconviction proceeding is to permit inquiry into the constitutional issues involved in the "original" proceeding, a petitioner

cannot obtain relief under the Act simply by " 'rephrasing previously addressed issues in constitutional terms' " in his or her petition. *People v. Flores*, 153 Ill. 2d 264, 277-78 (1992) (quoting *People v. Gaines*, 105 Ill. 2d 79, 90 (1984)). Such claims will be properly defeated by operation of waiver and *res judicata*. *Id.* at 278. The question of whether the trial court erred in refusing to give an involuntary manslaughter instruction was raised on direct appeal, albeit not phrased in constitutional terms. So, Luis previously raised this issue, and it is barred by *res judicata*. The trial court properly dismissed it. See *People v. Blair*, 215 Ill. 2d 427, 447 (2005) (trial court may properly dismiss first-stage petition based on *res judicata*).

¶ 66                                                    Text Messages

¶ 67        According to Luis, the trial court improperly allowed into evidence irrelevant text messages of a sexual nature exchanged between he and Sandra that were prejudicial and denied him the right to a fair trial. Luis notes that in dismissing his petition, the trial court found that Luis opened the door for questions about the text messages—on direct examination, he denied exchanging messages of a sexual nature with Sandra. In addition, the court found that the messages went to the issue of Luis's credibility. Luis contends, however, the questions on direct examination about sexually explicit texts between Sandra and Andy were foundational; they went to the issue of how he learned about her affair. He asserts that, conversely, the text messages he exchanged with Sandra had no probative value, had no bearing on his guilt or innocence, and did not prove or disprove a disputed fact or relate to what happened on the night of the altercation. Luis argues the messages served only to prejudice him in minds of jurors, who might find these messages inappropriate or evidence that he was a sexual deviant.

¶ 68        Generally, cross-examination is limited in scope to the subject matter of direct examination of the witness and to matters affecting the credibility of the witness. This limitation is construed liberally, however, to allow inquiry into whatever subject tends to explain, discredit, or destroy the witness's direct testimony. *People v. Terrell*, 185 Ill. 2d 467, 498 (1998). The latitude to be given on cross-examination falls within the trial court's discretion. *People v. Hall*, 195 Ill. 2d 1, 23 (2000). A reviewing court will not interfere unless the trial court plainly abused its discretion resulting in manifest prejudice to the defendant. *Id.*

¶ 69        Luis asserts that the questions on direct examination were foundational to establish that the text messages came from Sandra's boyfriend and did not open the door to cross-examination. But Luis had already testified the messages were sent by "Denise," which turned out to be a fake name but were obviously not an exchange between Luis and Sandra. When defense counsel asked Luis if he and Sandra ever sent "sexy pictures" to each other, he said no. This opened the door to the line of questioning by the State on cross-examination and was relevant to Luis's truthfulness. As the trial court noted in its dismissal order, "[t]he State's cross-examination questions pertained to subject matter first brought up on direct examination and disputed the veracity of petitioner's testimony, which concerns his credibility as a witness." Luis was a witness on his own behalf, and "[a]ny permissible matter which affects the witness's credibility may be developed on cross-examination." *People v. Kliner*, 185 Ill. 2d 81, 130 (1998). On direct, Luis falsely stated that he and his wife did not exchange messages of a sexual nature, even though they had done so in the immediate days before their fight. This does go to Luis's credibility and was a permissible subject of cross-examination. Thus, the trial

court did not err in summarily dismissing this claim in his postconviction petition.

¶ 70                              Ineffective Assistance of Appellate Counsel

¶ 71       Lastly, Luis contends the trial court erred in summarily dismissing his claims that his appellate counsel was ineffective by (i) failing to argue the trial court's refusal to submit a jury instruction on involuntary manslaughter violated his right to due process and a fair trial and (ii) failing to argue the trial court erred by admitting into evidence the text messages between him and Sandra.

¶ 72       The *Strickland* test applies to claims of ineffective assistance of appellate counsel. *People v. Rogers*, 197 Ill. 2d 216, 223 (2001). A defendant who claims that appellate counsel was ineffective for failing to raise an issue in his or her appeal must allege facts demonstrating that (i) the failure was objectively unreasonable and (ii) counsel's decision prejudiced the defendant. *Id.* Appellate counsel is not obligated to brief every conceivable issue, and it is not incompetence to refrain from raising issues that, in counsel's judgment, are without merit, unless counsel's assessment is patently wrong. *People v. Simms*, 192 Ill. 2d 348, 362 (2000). Thus, the prejudice inquiry requires the reviewing court to examine the merits of the underlying issue. *Id.* Appellate counsel's choices about which issues to pursue are entitled to substantial deference. *Rogers*, 197 Ill. 2d at 223.

¶ 73       First, on the involuntary manslaughter jury instruction, appellate counsel did raise the issue on direct appeal, arguing that when Luis beat Sandra, he was acting under sudden and intense passion stemming from serious provocation. He asserted that the manner of his discovery was akin to being present during an adulterous act and warranted a second degree murder instruction. In his postconviction petition, Luis asserts his appellate counsel did not properly raise the issue because instead of arguing the court's error was an abuse of discretion based on state law, he should have framed it as a violation of his constitutional due process rights, which the appellate court would have reviewed *de novo*.

¶ 74       In its order summarily dismissing Luis's petition, the trial court observed that the United States Supreme Court has addressed the issue of due process rights to a jury instruction only in the context of capital cases and expressly reserved the question of a defendant's general constitutional right to a jury instruction. See *Beck v. Alabama*, 447 U.S. 625, 637 (1980). Luis argues, however, that the absence of binding precedent should not have precluded his appellate counsel from raising the argument. He also asserts support for his due process argument in Justice O'Connor's concurring opinion in *Gilmore v. Taylor*, 508 U.S. 333, 348-49 (1993) (O'Connor, J., concurring, joined by White, J.). There, Justice O'Connor stated that "erroneous state-law instructions *** may violate due process and hence form the basis for relief, even in a noncapital case." *Id.* at 349. Although Justice O'Connor's concurrence is not binding authority, Luis asserts it is an "arguable" foundation for an ineffective assistance of counsel claim at the first stage.

¶ 75       We agree that the absence of Supreme Court precedent does not preclude appellate counsel from raising the issue. But it does support a finding that appellate counsel was not incompetent for deciding instead to argue, as appellate counsel did, that the trial court abused its discretion by denying the involuntary manslaughter instruction. It was reasonable for appellate counsel to decide that in the absence of cases to support the due process argument, he was more likely to succeed by arguing that the trial court abused its discretion in refusing the instruction.

¶ 76	Moreover, Justice O'Connor's concurring opinion in *Gilmore* does not, as Luis contends, lend strong support to his due process argument. In *Gilmore*, the defendant received an erroneous jury instruction and the court held that outside of capital cases, "instructions that contain errors of state law may not form the basis for federal habeas relief." *Id.* at 342 (majority opinion). Thus, Justice O'Connor's concurrence was addressing the possibility of a due process claim in noncapital cases where the instruction was incorrect, not where the trial court's decided against giving a requested jury instruction based on the evidence. In the absence of any cases, we cannot say that Luis has a meritorious argument that his due process rights were violated. Thus, he cannot arguably show that he was prejudiced by appellate counsel's failure to further develop the due process argument.

¶ 77	As to the cross-examination regarding the text messages between Luis and Sandra, failing to raise this issue did not amount to ineffective assistance of counsel. As noted, unless the underlying issue is meritorious, petitioner suffered no prejudice from counsel's failure to raise it on direct appeal. We already have found a lack of merit in Luis's argument that the trial court erred in permitting cross-examination about the text messages he and Sandra exchanged. Appellate counsel was not ineffective for failing to raise it on appeal, and the trial court correctly dismissed Luis's ineffective assistance of appellate counsel claim.

¶ 78	Affirmed.