# Illinois Official Reports

## Appellate Court

<div style="border:1px solid black">

### *People v. Hardy*, 2020 IL App (1st) 172485

</div>

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEMAR HARDY, Defendant-Appellant. |
| District & No. | First District, First Division<br>Nos. 1-17-2485, 1-17-2487 cons. |
| Filed | December 28, 2020 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, Nos. 14-CR-15929, 14-CR-21461; the Hon. Thomas J. Byrne, Judge, presiding. |
| Judgment | Affirmed as modified. |
| Counsel on Appeal | DePaul University Legal Clinic, of Chicago (Gilbert Lenz, of counsel, and Allison Foellger, law student), for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Matthew Connors, and Tyler J. Cox, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE HYMAN delivered the judgment of the court.<br>Presiding Justice Walker concurred in part and dissented in part, with opinion.<br>Justice Pierce concurred in part and dissented in part, with opinion. |

**OPINION**

¶ 1            The State charged Lemar Hardy, in separate cases, with one count of attempted aggravated criminal sexual assault after he attacked two victims, X.D. and T.C., a week apart. Hardy's counsel agreed to a joined jury trial, and after hearing the identification testimony of seven witnesses implicating Hardy, the jury found him guilty in both cases. The trial court sentenced Hardy to 25-year extended terms in prison for each offense, imposed consecutively for a total of 50 years.

¶ 2            Hardy claims ineffective assistance of his trial counsel for failing to file (i) a motion to sever after agreeing to proceed with a simultaneous jury trial based on an erroneous understanding of other-crimes evidence and (ii) a motion to suppress certain identifications as the product of a suggestive lineup. He also contends that the court abused its discretion by imposing excessive 25-year sentences to take effect consecutively.

¶ 3            We disagree with Hardy's claims of ineffective assistance of counsel. Even had trial counsel successfully moved to sever the cases and suppress the lineup identifications, we find no reasonable probability that the outcome of either trial would have been different. Contrary to Hardy's argument, the evidence in the trials would be substantially the same, assuming counsel performs as Hardy insists that he should have. Accordingly, Hardy suffered no prejudice from counsel's argued deficiencies. We agree, however, that Hardy's 25-year sentences, while properly ordered to run consecutively, are excessive in light of the trial court's express finding that Hardy is capable of rehabilitation. We affirm his convictions and modify Hardy's sentences to 15 years in each case, to run consecutively, for a sum of 30 years.

¶ 4                                                          Background

¶ 5            On July 31, 2014, as X.D. walked on South Oakley Avenue to the Chicago Transit Authority (CTA) Orange Line station at 35th Street and Archer Avenue, she saw a man walking toward her. She turned into the parking lot, and suddenly, the man she had just seen "came up from behind [her], lifted [her] dress, and ripped [her] underwear." He forced her to the ground "on [her] back, and [her] feet were lifted up." She was able to see the man while struggling to pull away. She would ultimately identify Hardy as her attacker.

¶ 6            Shortly after Hardy had forcefully removed her underwear, bystanders came to X.D.'s aid, and Hardy fled. One man, the owner of a nearby collision repair shop, testified that he had an unobstructed view of the attack. He "[d]efinitely" saw Hardy's face from about "50 to 60 feet away" and from as close as "20 feet." He told another man, working at a tire shop next door, to "run that guy down, catch him."

¶ 7            Before X.D.'s attack, the tire shop employee had seen Hardy "passing back and forth" under the viaduct for "about a half hour." Nothing blocked his view of the attack. He chased after Hardy as soon as X.D. started screaming. Asked which part of Hardy's face he could see, he said "[e]verything, the side, the front. As I was running behind him, he kept looking back; and I was able to see the side, on both sides." He testified that Hardy looked back at him "[b]etween 3 or 4, 4 times—4 times."

¶ 8            X.D. testified that "as [Hardy] turned around to run away, he lift[ed] his pants up. They were open. There was—like, I could see his pants were open; and there was a belt, still

- 2 -

unbuckled; and he ran away with my underwear." Her injuries included "scrapes and bruises on [her] right elbow" and a bruise "on the back of [her] thigh." Hardy made good on his escape.

¶ 9    Soon after, X.D. met with Chicago police officer Scott Ahern. She told him what happened and described her attacker as about 6 foot, 3 inches with corn rows, black eyes, black hair, a dark complexion, and a goatee. On August 5, 2014, Chicago police detective Darren Crowder interviewed X.D. by phone. She recounted the attack, providing the same description but adding that her attacker wore baggy, light blue jeans and a gray shirt.

¶ 10    Chicago police detective Patricia Sullivan conducted lineups with the two eyewitnesses to X.D.'s attack, both of whom identified Hardy. One selected Hardy "[b]ecause [he] will never forget his face." The other had no doubt he "picked out the right guy." X.D., however, was out of state and unavailable to view the live lineup. She instead met with Crowder on August 22 to view a six-person photo array consisting of Hardy and five "fillers." She identified Hardy.

¶ 11    On the morning of August 8, 2014, T.C. was returning to work from a nearby Walgreens. While approaching a viaduct near 36th Street and South Washtenaw Avenue, she saw a "black man, young" who was "quite tall," walking on the other side of the street in the opposite direction. She lost sight of the man and continued through the viaduct. She "heard footsteps that were quite close to [her], closer than someone would normally be walking behind someone else." As she emerged from the viaduct, someone grabbed her and then took her down to the ground.

¶ 12    T.C. fell to her knees and backwards "on [her] hind quarters." Her attacker, whom she ultimately identified as Hardy, held her down with one hand and covered her mouth with the other. He tried to remove her skirt, eventually moving his other hand from her mouth to the fabric. T.C. testified that she asked Hardy "why?" and he said, "[S]how me your p***. Shut the f*** up, or I'll kill you." While they struggled on the ground, T.C saw her attacker's face "in profile," "quite close to [hers]," and as it "went in and out of [her] periphery." She screamed, and two men ran toward her, prompting Hardy to run.

¶ 13    Chicago police officer Chris Hackett responded to a 911 call and a flash message describing T.C.'s attacker: "[m]ale black, approximately six foot, early 20s, wearing a white T-shirt, black shorts with red trim, he had slight facial hair, and braids of some sort." Hackett testified that about "35 to 40 minutes" after receiving the call, he saw a man matching the description entering the building at 2727 West 37th Place, from "about a hundred fifty feet down."

¶ 14    Officers surrounded the building, entered through a common door, and met with the first-floor tenant, who said he had heard somebody go to the second floor. The tenant provided officers with the landlord's phone number. The landlord arrived "30 to 40 minutes later" and gave Hackett a key to the second-floor unit. Officers entered, arrested Hardy, and recovered a pair of shorts on the floor of the front room.

¶ 15    A few hours later, T.C. met with Detective Sullivan at the police station. She viewed a four-person live lineup consisting of Hardy and three "fillers," the same lineup viewed that day by witnesses to X.D.'s attack. T.C. identified Hardy. Sullivan testified that T.C. "had no problem picking him out" of the lineup.

¶ 16    Sullivan also conducted live lineups with three additional witnesses to T.C.'s attack—all identified Hardy. Two witnesses testified that they had no doubt in their minds that Hardy was the attacker.

¶ 17 T.C. agreed with Hardy's counsel, on cross-examination, that height and complexion differed between some individuals in the lineup. Three more State's witnesses also agreed, on cross-examination, that some individuals differed in height, complexion, and type of hair. According to Sullivan, Hardy and one of the fillers had a "very different color complexion."

¶ 18 Before trial, the State had elected to proceed first on T.C.'s case and filed a motion to allow other-crimes evidence at trial "under theories of identity, intent, motive, absence of mistake or accident, the existence of a common plan or design, lack of consent, absence of innocent frame of mine [*sic*], and propensity to commit sex crimes." Specifically, the State sought to introduce X.D.'s attack and two older cases as other-crimes evidence. The trial court granted the motion in part, permitting "those prior acts *** for propensity, identity, and intent."

¶ 19 Hardy filed a motion, seeking to "quash [his] arrest and thus suppress the subsequent identification procedures" and to "suppress the evidence that was seized in the residence itself." The State conceded that the officers had not obtained either a search warrant or an arrest warrant, arguing, instead, that they had probable cause and exigent circumstances to enter his residence. The trial court granted the motion and found that while the officers did have probable cause to arrest Hardy, they lacked exigent circumstances sufficient to permit their warrantless entry. The court further ruled that the exclusionary rule would apply to the physical evidence recovered inside, but "certainly would not apply" to "the identification procedures which followed [Hardy's] arrest at the police station."

¶ 20 On June 20, 2017, the State first mentioned "hav[ing] discussed with counsel possibly joining the two pending felonies." The State reminded the trial court that it had "previously granted other-crimes motions where the victim is going to testify on the nonelected attempt sexual assault case." On July 10, 2017, the trial court addressed the joinder issue:

"MR. PRISCO: Judge, there is an issue that we previously discussed; and that was the issue of joinder of the two pending cases. You had previously granted other crimes evidence for—

THE COURT: Mr. Burtz indicated that he wouldn't have an objection for you to proceed on these two cases together, correct?

MR. PRISCO: I think today that's the—

MR. BURTZ: That's correct, Judge.

THE COURT: Okay. He indicated that was his—his strategy; but he wanted time to consider, is that right?

MR. BURTZ: Right. That is, Judge. I indicated I would speak about it with Mr. Hardy, which I have done; and I indicated to Mr. Prisco earlier today, that we would be willing to proceed in that fashion.

THE COURT: All right. And which two cases?

MR. PRISCO: Judge—

THE COURT: The elected case, as well—

MR. PRISCO: 14-CR-15929, and the case that would be joined with that is 14-CR-21461.

MR. BURTZ: Basically, both 14 cases, Judge.

THE COURT: All right. Those cases will be joined for trial on the next date. Which is—

MR. PRISCO: July 17th, [Y]our Honor, Jury Trial."

¶ 21     The parties agreed to have the trial court admonish the jury that Hardy was charged in separate cases and "[t]hat's the only point that [the trial court] would be addressing, that there are two separate cases that had been joined for the purpose of trial." The trial court observed that "with other crimes evidence it would be proper for [the jury] not only to give separate consideration as to each case, but also they would be allowed to consider the fact[s] of each case for the purposes of propensity and those other proof of crimes conduct." The State interjected and conceded that it "may have been mistaken in seeking propensity for attempt" based on the statute. The State withdrew the issue of propensity but still intended to introduce proof of other crimes as they related to intent and identification.

¶ 22     The trial court noted that the jury would be entitled to an other-crimes admonishment unless Hardy objected. The State responded that because it would not be calling a witness from a 2006 case, the other crimes and other conduct testimony would be limited to the case for which Hardy was being tried. Hardy's counsel reserved the possibility of objecting to this instruction but indicated counsel "would certainly object to any instruction during testimony."

¶ 23     In each case, the jury found Hardy guilty of attempted aggravated criminal sexual assault. The trial court determined Hardy to be eligible for extended term sentences, given a 2006 juvenile adjudication for criminal sexual assault. At sentencing, the State introduced victim impact statements from X.D. and T.C. In allocution, Hardy said, "I am very regretful of my actions, and I would just like to put this behind me and move forward to rehabilitate myself." The trial court indicated it would "never close out the potential for an individual for rehabilitation." Nevertheless, the court emphasized that "having regard for the nature and circumstances of the offense and the history and character of [Hardy], it is [the trial court's] opinion that consecutive sentences are required to protect the public from further criminal conduct." The court also noted the seriousness of the offenses and considered the attacks particularly brazen, given that Hardy committed them in broad daylight near witnesses. Hardy received two consecutive terms of 25 years, totaling 50 years' imprisonment.

¶ 24     Hardy filed a motion for new trials, claiming that the trial court erred in granting the State's motion to admit proof of other-crimes evidence. In opposing the motions, the State argued it "did not present any other crimes evidence" because "[t]hese cases were joined, and [Hardy] was tried on the merits and evidence of each of those cases." The trial court denied Hardy's motions, describing the evidence of guilt in both cases as "overwhelming." The trial judge also denied Hardy's motion to reconsider the sentences.

¶ 25                                         Analysis

¶ 26     Hardy raises two arguments. First, he alleges ineffective assistance of counsel for (i) failing to file a motion to sever the two cases after agreeing to proceed with a simultaneous jury trial based on an erroneous understanding of other-crimes evidence and (ii) failing to file a motion to suppress certain identifications he claims resulted from a suggestive lineup. Second, Hardy challenges as excessive the trial court's imposition of two extended 25-year sentences and its order to have them served consecutively. We disagree with his claims of ineffective assistance of counsel but find, under the facts, the length of his sentences to be excessive.

¶ 27 <div align="center">Ineffective Assistance of Counsel</div>

¶ 28 A defendant has the right to effective assistance of counsel. See U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. To establish a claim of ineffective assistance of counsel, a defendant must show (i) counsel's representation fell below an objective standard of reasonableness and (ii) prejudice resulted from counsel's deficient performance. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 22 (citing *People v. Flowers*, 2015 IL App (1st) 113259, ¶ 41, citing *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984)). A defendant's " '[f]ailure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim.' " *Id.* (quoting *Flowers,* 2015 IL App (1st) 113259, ¶ 41).

¶ 29 *Strickland* advises that, where "easier," we should "dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice." *Strickland*, 466 U.S. at 697. We need not determine whether Hardy satisfied the deficiency prong of *Strickland* because he cannot establish the requisite prejudice as to either ineffectiveness claim. See, *e.g.*, *People v. Viramontes*, 2017 IL App (1st) 160984, ¶ 45 (citing *People v. Graham*, 206 Ill. 2d 465, 476 (2003)); see also *People v. Slater*, 393 Ill. App. 3d 977, 991-92 (2009) ("reviewing court need not consider counsel's performance before deciding whether defendant was prejudiced").

¶ 30 To establish prejudice, a defendant must show a reasonable probability that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different. *People v. Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 694). A reasonable probability means "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. This probability need not be a preponderance of the evidence. See *People v. Lucious*, 2016 IL App (1st) 141127, ¶ 45 ("prejudice may be found even when the chance that minimally competent counsel would have won an acquittal is 'significantly less than 50 percent,' as long as a verdict of not guilty would be reasonable" (internal quotation marks omitted)). We agree with the trial court that the evidence against Hardy was "overwhelming." The outcome of neither trial would have been different, even had the two cases been severed and even had the live lineup identifications been suppressed.

¶ 31 <div align="center">Counsel's Failure to Move for Severance</div>

¶ 32 Hardy claims that trial counsel should have moved for severance after the State agreed that other-crimes evidence was not admissible to show propensity. According to Hardy, the jury heard "inadmissible, unlimited evidence." He argues that trial counsel's failure to file a motion to sever was objectively unreasonable "because such a motion would have been granted and it would have limited the evidence from the other incident to a far less prejudicial form." Hardy relies almost exclusively on *People v. Walston*, 386 Ill. App. 3d 598 (2008), and *People v. Johnson*, 2013 IL App (2d) 110535.

¶ 33 Hardy's argument parallels that made in *Walston*, in which the defendant "[did] not challenge that evidence of both crimes would have been admissible in either trial; he argue[d] only that less thorough evidence of each crime would have been admissible in the other trial." *Walston*, 386 Ill. App. 3d at 611. But this court affirmed the trial court's denial of the defendant's motion to sever—a denial made on the basis that had the counts been severed, each jury still would have heard evidence regarding the other aggravated criminal sexual assault as other-crimes evidence. Thus, the defendant would not be prejudiced. *Id.* at 600.

¶ 34 Hardy contends a "jury at a severed trial would have heard much less [evidence of the other charged incident]" so as to avoid a trial-within-a-trial rendering the other-crimes evidence

<div align="center">- 6 -</div>

unduly prejudicial. But this assertion constitutes speculation and cannot support a claim for ineffective assistance of counsel. See *People v. Gosier*, 165 Ill. 2d 16, 24 (1995). Before the two cases were joined, the trial court admitted other-crimes evidence for the purposes of intent and identification. Separate juries hearing severed cases would have been presented with substantially similar testimony.

¶ 35    This court explained in *Walston* that "error [in misjoinder] will be deemed harmless where the evidence of all of the charged crimes would have been admissible in the separate trials that would have taken place if not for the misjoinder." *Walston*, 386 Ill. App. 3d at 609. So, we may conclude that Hardy suffered no prejudice from potential misjoinder. See *id.* at 625.

¶ 36    The State may generally introduce other-crimes evidence against a defendant "only for the purpose of showing '*modus operandi*, intent, identity, motive ***' or 'any purpose other than to show the propensity to commit crime.' " *Id.* at 609-10 (quoting *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991)). Other-crimes evidence admitted into evidence must be limited strictly to the exception to which it is tied. *Id.* at 613 ("evidence beyond that necessary to meet the purpose of the exception [is] extraneous, and therefore inadmissible, other-crimes evidence"). The State concedes to mistakenly seeking propensity as a basis for introducing other-crimes evidence, an error it identified and corrected before trial. And before the two cases were joined, the trial court had already admitted other-crimes evidence for intent and identification.

¶ 37    Hardy asks that we disregard *People v. Trail*, 197 Ill. App. 3d 742, 746 (1990) ("where *** 'other crimes' evidence is properly admissible, the potential prejudice to a defendant of having the jury *decide* two separate charges is greatly diminished because the jury is going to be receiving the evidence about both charges anyway" (emphasis in original)) and its progeny. Instead, he asks that we base our analysis on "the far more thorough discussion of this issue in cases like *Walston*."

¶ 38    Hardy does not direct us to any other "cases like *Walston*," with "far more thorough discussion[s] of this issue," aside from *Johnson*, 2013 IL App (2d) 110535, a readily distinguishable decision. In *Johnson*, trial counsel agreed to joinder of charges for unlawful possession of a weapon by a felon and domestic battery. *Id.* ¶¶ 4-5. This court concluded that the defendant met his burden to affirmatively prove *Strickland* prejudice. *Id.* ¶ 58. But we specifically found "[t]he joinder *and the use of a defective instruction *** created the reasonable probability that the jury found defendant guilty *** after improperly considering [other-crimes evidence]." (Emphasis added.) *Id.* Indeed, we concluded that "the joinder of the charges, *coupled with the improper jury instructions*, mandate[d] new, separate trials with precise jury instructions." (Emphasis added.) *Id.* ¶ 42. Hardy raises no claim of instructional error. Consequently, we cannot apply our prejudice analysis in *Johnson* to Hardy's ineffectiveness claim.

¶ 39    Assuming, without deciding, that a motion to re-sever the joined cases would have been successful, we must only ascertain whether a reasonable probability exists that the outcome of either of the trials would have differed. See *People v. Utley*, 2019 IL App (1st) 152112, ¶ 55. Hardy, to this end, does not dispute that the trial court properly admitted the other-crimes evidence for intent and identification before the cases were joined. He does, however, raise a concern that at severed trials "[t]he State's evidence in each of these cases would have looked much different." We disagree.

¶ 40    The testimony from T.C., X.D., and the eyewitnesses before separate juries in severed trials would have been substantially similar. Hardy correctly states that, in severed trials, the trial

court would have been obligated to scrupulously avoid a "mini-trial" when admitting other-crimes evidence. *E.g.*, *People v. Bedoya*, 325 Ill. App. 3d 926, 938 (2001). For example, we have found error where other-crimes evidence consisted of 7 live witnesses, 25 photo exhibits, and several physical exhibits. *Id.* at 940-41. We reasoned that "[t]he detail and repetition presented to the jury had nothing to do with the purported purpose of the evidence." *Id.* Hardy does not contest the admissibility of other-crimes evidence for the purpose of establishing identity. The victim and eyewitnesses would have been relevant witnesses in the other case, even for that limited purpose. The only other witness the State called, Officer Hackett, could testify about the circumstances of Hardy's arrest in both cases as well. *E.g.*, *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 46 (" 'evidence of other crimes is admissible *** to show the circumstances surrounding defendant's arrest' " (quoting *People v. Aguilar*, 396 Ill. App. 3d 43, 55 (2009)).

¶ 41    Testimony from either victim or the unique eyewitnesses to their respective attacks would not have constituted a "mini-trial" had it been admitted in the other's case, particularly when the other-crimes evidence was admitted for the purpose of identity. *Contra Bedoya*, 325 Ill. App. 3d. at 941 (6 of the State's 12 witnesses testified to evidence of an uncharged crime (citing *People v. Brown*, 319 Ill. App. 3d 89 (2001))); see also *People v. Nunley*, 271 Ill. App. 3d 427, 433 (1995) (Theis, J., dissenting) (evidence of uncharged conduct included graphic testimony from multiple witnesses unrelated to any ultimate issue in charged case).

¶ 42    At oral argument, Hardy's counsel discussed *People v. Lewis*, 240 Ill. App. 3d 463 (1992), which found prejudice by defense counsel's failure to move to sever two murder charges. *Id.* at 469. Like *Johnson*, we find *Lewis* distinguishable. In *Lewis*, trial counsel raised "markedly different defenses" to the joined murder charges, denying involvement in one while raising a justification defense to the other. *Id.* Here, one theory of the case persists for both: attempts to highlight perceived weaknesses in the lineup identifications and to attack witness credibility. Detective Sullivan, a witness called by Hardy's counsel, administered the same live lineups to the eyewitnesses to each offense, save for X.D., and her cross-examination was the basis for trial counsel's attempt to undermine the identifications. So, unlike in *Lewis*, where contrary defenses served to confuse the jury and increase prejudice to the defendant (*id.*), the single theory of defense here amplified any potential weakness in the State's evidence across both of Hardy's joined cases.

¶ 43    Hardy also argues that, in severed trials, Hardy's counsel would have been obligated to request a limiting instruction for the other-crimes evidence. That is far from obvious. See *People v. Johnson*, 368 Ill. App. 3d 1146, 1161 (2006) ("Counsel may have made a tactical decision not to request such an instruction to avoid unduly emphasizing the other-crimes evidence."). Accordingly, we find no reasonable probability that the outcomes of the trials would have been different had counsel performed adequately. Thus, Hardy fails to satisfy *Strickland*'s prejudice prong.

¶ 44                    Counsel's Failure to File Motion to Suppress

¶ 45    Hardy also claims ineffectiveness of counsel for failing to file a motion to suppress the six identifications made during the live lineup. He challenges them as unreliable because the lineup itself was unduly suggestive for "[having] only four individuals, not the usual six" and because "Hardy was the only person in the lineup who even arguably possessed all of the characteristics of the suspect described by the witnesses." As with the unfiled motion to sever,

we do not find a reasonable probability that the outcome would have been different, even assuming the testimony about the lineups was suppressed.

¶ 46 To establish prejudice under *Strickland*, where an ineffectiveness claim is predicated on trial counsel's failure to file a suppression motion, a defendant must "demonstrate that the unargued suppression motion is meritorious, and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 15. We focus on the second aspect of prejudice, as it resolves Hardy's claim. Specifically, we find a sufficient independent basis for enough of the witnesses' identifications that their in-court identifications would have been allowed and the outcome of the trials would not have been different.

¶ 47 Hardy argues that the State presented no physical evidence linking him to either offense and, as a result, its case "largely rested upon the eyewitness identifications"—evidence which he asserts "would have been much weaker had the lineup identifications been suppressed." He maintains that, had the motion been granted, the State could present only the out-of-court identifications from X.D.'s photo array. For the purpose of our analysis, we will take that as a given and need only determine whether a reasonable probability exists as to whether the outcome of the two trials would have differed had the lineup identification testimony been excluded. See *Utley*, 2019 IL App (1st) 152112, ¶ 55.

¶ 48 We address Hardy's argument on its own terms. He claims the "evidence [of identification] would have been much weaker had the lineup identifications been suppressed." We cannot agree. To explain why, we evaluate the "independent origin" of the witnesses' ability to identify Hardy in court. To determine whether the in-court identifications are independently reliable, we weigh six factors: (i) the opportunity of the witness to view the offender at the time of the offense, (ii) the witness's degree of attention, (iii) the accuracy of any previous descriptions of the offender, (iv) the level of certainty at the time of confrontation, (v) the length of time between the offense and the confrontation, and (vi) any previous acquaintance with the offender before the offense. *People v. McTush*, 81 Ill. 2d 513, 521 (1980).

¶ 49 Presiding Justice Walker would have us supplement the *McTush* factors with additional considerations adopted in other jurisdictions based on scientific understandings of eyewitness identifications and human memory. See *State v. Henderson*, 27 A.3d 872 (N.J. 2011). In Presiding Justice Walker's view, our supreme court "has not forbidden lower courts from considering research concerning the reliability of eyewitness identification testimony." This is true but not precise. Our supreme court has found the research regarding the science of eyewitness identifications "well settled" and "well supported," such that counsel can introduce it through expert testimony in the *trial* court. *People v. Lerma*, 2016 IL 118496, ¶ 24. Indeed, the test announced by the Supreme Court of New Jersey came after the court "appointed a Special Master to evaluate scientific and other evidence about eyewitness identifications" who made "extensive" findings after a hearing, during which seven experts testified and the Special Master considered "hundreds" of scientific studies. *Henderson*, 27 A.3d at 877. Hardy's appellate counsel does not argue that trial counsel should have called such an expert—an argument that exists independently of whether the lineups were suppressed. Without this type of testimony in the record, we decline to announce or apply a new test with additional factors.

¶ 51     X.D. and T.C. both had sufficient opportunity to observe the offender. While the man came up from behind X.D., he pushed her to the ground on her back, and she was able to see the offender's face with nothing obstructing her view. As to T.C., even though she only saw the man's profile during the attack, his face was "quite close to [hers]," and she saw him walking toward her across the street before the attack. Neither victim testified about how long they were able to view the offender's face but we have repeatedly found sufficient opportunity to observe where that opportunity came from a much greater distance and lasted only "several seconds." *E.g.*, *People v. Negron*, 297 Ill. App. 3d 519, 531 (1998) (collecting cases).

¶ 52     James Drougas and Francisco Cruz, the witnesses to X.D.'s attack, also had a sufficient opportunity to observe the offender. Drougas "definitely" saw the offender's face from as much as 60 and as little as 20 feet away. He watched the offender get closer to X.D. for 30 seconds. He could "clearly see," and nothing obstructed his view. Cruz had seen the offender going "back and forth" under the viaduct for about 30 minutes before the attack. As the offender got closer to X.D., he got within 25 feet of Cruz and nothing obstructed Cruz's view. We have rejected challenges to the reliability of identifications made from comparable or greater distances. *People v. Houston*, 185 Ill. App. 3d 828, 833-34 (1989) (finding identification sufficient, despite defendant's argument that witness observed defendant from distance of 70 feet); *People v. Thomas*, 49 Ill. App. 3d 961, 968 (1977) (finding identification made from 50 feet sufficient).

¶ 53     The witnesses to T.C.'s attack had similarly sufficient opportunity to observe the offender. Homero Gutierrez saw the offender three separate times the morning of the attack. First, he saw the offender as he walked to work. He saw the offender's face for 10 to 15 seconds. Later he went outside and saw "the same young man" walking away from him. The man turned back two or three times, and Gutierrez saw his face from a half-block away. He followed the man until the train viaduct, then turned around. He got about a half-block away again and turned to see the same man walk behind T.C. and attack her. Before the man ran away, he turned, and Gutierrez "clearly s[aw] his face again." Milton Garza saw the offender twice. The first time occurred as he walked away from Burroughs Elementary and turned around two or three times, allowing Milton to see his face. The second time occurred as the offender approached T.C. Milton could see his face again from less than a block away. Of the witnesses, Cruz and Milton had the shortest opportunity to observe, but even their observations hold up under our precedents.

¶ 54     As to all of the witnesses, to varying degrees of strength, this factor favors reliability.

¶ 56     We also find a sufficient degree of attention paid by the witnesses to the identity of the offender. Presiding Justice Walker emphasizes, and we acknowledge, that the stress of a situation can diminish the reliability of eyewitness testimony. *E.g.*, *In re J.J.*, 2016 IL App (1st) 160379, ¶ 30. All of the witnesses testified that they could see the offender's face unobstructed. At least one witness to each offense (Cruz for X.D.'s attack and Gutierrez for T.C.'s attack) saw the offender that same day, before any stressful situation had developed. We require some kind of testimony about a distraction or other lack of attention before finding this factor weighs against the State. See *In re O.F.*, 2020 IL App (1st) 190662, ¶¶ 42-46. Here, we have the opposite—testimony that each witness was able to focus on the offender's face.

We find this factor weighs in favor of reliability.

¶ 57                          Accuracy of Previous Descriptions

¶ 58      Only the victims gave descriptions of the offender before viewing the lineup, as far as the record reveals. X.D. described the offender as 6 foot, 3 inches, with black hair in corn rows, black eyes, a dark complexion, and a goatee. She said he was wearing baggy light blue jeans and a grey shirt. T.C. described the offender as a black man between 5 foot, 10 inches and 6 foot tall with black hair in dreadlocks, brown eyes, and a dark complexion. She estimated he was about 150 pounds and 20 years old. Hardy stands 6 foot, 2 inches and is 175 pounds. As Presiding Justice Walker acknowledges in his separate writing, Hardy indeed had braided hair. Justice Walker rightly agrees that the victims' descriptions matched Hardy "reasonably well." *Supra* ¶ 109. We add that the descriptions matched each other reasonably well. As to X.D. and T.C., this factor weighs in favor of reliability. As to the other witnesses, because it is unclear whether they were ever asked for pre-lineup descriptions, this factor weighs neither for nor against reliability.

¶ 59                     Level of Certainty at the Time of Confrontation

¶ 60      All the witnesses to view the live lineup testified they had no doubt that the person they picked out (Hardy) was the offender. Of course, their certainty during the lineup is of little value to us because we have assumed the lineup was suspect. Based on that assumption, we further assume that their certainty at the time of the lineup could have been tainted by the lineup's suggestiveness. All the witnesses identified Hardy in court as the attacker. In-court identifications come with their own spotlighting problems. See, *e.g.*, *United States v. Correa-Osorio*, 784 F.3d 11, 20-21 (1st Cir. 2015) (affirming identification but recognizing in-court identifications as "constitutional danger zones" that inherently carry "some element of suggestion"). Moreover, none of the witnesses was expressly asked about the certainty of their in-court identification. Overall, we find this factor weighs neither in favor of, nor against, reliability.

¶ 61                     Length of Time Between Offense and Confrontation

¶ 62      All the witnesses, save X.D., viewed the lineup within, at most, a week after the offense. As with the certainty factor, however, we have assumed the suggestiveness of the lineup, and so that confrontation seems the wrong one to use. Instead, we will use the witnesses' confrontation with Hardy at trial, as reliability of their in-court identifications captures what the *McTush* test is meant to evaluate. Almost three years passed before trial, so this factor weighs against the reliability of the witnesses' identifications. X.D., however, identified Hardy in an unchallenged photo array only three weeks after the offense. We have consistently found similar time periods short enough to support reliability. See *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 97 (approving of time period of 10 days to two weeks between offense and identification).

¶ 63                              Previous Acquaintance

¶ 64      We have occasionally described the factor of a witness's acquaintance with the offender as determining whether the witness had ever "met" the offender previously. See *J.J.*, 2016 IL App

(1st) 160379, ¶ 38 (focusing on unreliability of "stranger" identifications). It seems, though, we have more consistently applied this factor by determining whether the witness had previous familiarity with the offender at all. *People v. Smith*, 362 Ill. App. 3d 1062, 1079 (2005) (finding identification reliable in part because witness had "occasionally seen [defendant] on the streets of Evanston"); *People v. Barnes*, 364 Ill. App. 3d 888, 895 (2006) (finding identification reliable in part because witness had encountered the defendant multiple times). Here, no testimony indicates that any of the witnesses ever met Hardy before.

¶ 65    But there is testimony from two witnesses to the attacks—one in each case—that they had previously seen or encountered him in the neighborhood. Cruz had seen Hardy twice before the day of the offense. Most recently, two days before the attack on X.D., Cruz saw Hardy "at the bus stop" and was able to see his face. Gutierrez, who witnessed T.C.'s attack, had seen Hardy in the neighborhood that same morning. As he walked to work, he passed Hardy and was able to see his face for 10 to 15 seconds. Cruz and Gutierrez did not have the "acquaintance" with Hardy as conceived by the court in *J.J.*, but we find this factor weighs slightly in favor of the reliability of their identifications.

¶ 66    On balance, we find the *McTush* factors weigh in favor of the reliability of all the witnesses' identifications, particularly, since an opportunity to observe is considered the most important factor. *People v. Wehrwein*, 190 Ill. App. 3d 35, 39 (1989). Seven witnesses, including both victims, testified in detail about their ability to observe Hardy. X.D. and T.C. looked directly at his face. One eyewitness to X.D.'s assault saw Hardy walking back and forth along a viaduct for 30 minutes before the attack on X.D. One eyewitness in each case chased Hardy; both saw Hardy's face as he turned around while he ran. The witnesses to T.C.'s attack described Hardy with enough precision to allow officers to find him nearby and arrest him. X.D. identified Hardy in a photo array that Hardy does not challenge.

¶ 67    Given the substantial testimony identifying Hardy—all independent of his lineup identifications—we cannot say a reasonable probability exists that the outcome of either trial would have been different, even had counsel successfully moved for suppression of the lineup identifications. Once more, we find Hardy failed to satisfy *Strickland*'s prejudice requirement.

¶ 68                                    Sentencing

¶ 69    The trial court sentenced Hardy to a 25-year extended term sentence in each of the joined cases and ordered the sentences to be served consecutively for a total of 50 years in prison. Hardy challenges every aspect of that sentence, arguing that (i) the trial court erred by imposing a discretionary extended term sentence in each case, (ii) the trial court erred by imposing discretionary consecutive sentences, and (iii) both underlying sentences of 25 years are excessive. We disagree with his first two claims but find his sentences excessive.

¶ 70    We begin with the statutory framework within which the trial court operated. Aggravated criminal sexual assault, as charged in both cases, is a Class X felony. 720 ILCS 5/11-1.30(d)(1) (West 2016). Attempt to commit a Class X felony is a sentence for a Class 1 felony. *Id.* § 8-4(c)(2). The sentencing range for a Class 1 felony is 4 to 15 years, unless the trial court imposes an extended-term sentence, in which case the sentencing range is 15 to 30 years. 730 ILCS 5/5-4.5-30(a) (West 2016). The trial court may, but need not, impose an extended term sentence if, among other things, a nonjuvenile defendant has a previous juvenile adjudication, less than 10 years old, for an offense that would have been a Class X or Class 1 felony had it been committed by an adult. *Id.* § 5-5-3.2(b)(7). The trial court may, but need not, impose

consecutive sentences when "it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant." *Id.* § 5-8-4(c)(1).

¶ 71 Hardy does not challenge his statutory eligibility for extended term or consecutive sentences, only the trial court's exercise of its discretion in determining whether to impose them. We will review each aspect of Hardy's sentencing argument to determine whether the trial court abused its discretion. *E.g.*, *People v. Geiger*, 2012 IL 113181, ¶ 27 (abuse of discretion is general standard of review for claimed sentencing); *People v. Hay*, 362 Ill. App. 3d 459, 468 (2005) (applying abuse of discretion after determining defendant eligible for extended term); *People v. Buckner*, 2013 IL App (2d) 130083, ¶ 36 (reviewing imposition of nonmandatory consecutive sentences for abuse of discretion).

¶ 72 Hardy's failure to disaggregate what we perceive to be three distinct sentencing arguments makes our review more complicated. He argues that his overall 50-year sentence is unreasonable and then adds, almost as an afterthought, "In light of all this, the trial court abused its discretion when it imposed an extended term sentence in each case *** and when it ordered that Hardy's 25-year sentences run consecutively." He cites, though does not discuss in detail, cases addressing consecutive and extended term sentences and spends much of his argument explaining his position on the evidence presented at sentencing. So, his argument does not technically violate Illinois Supreme Court rules (see Ill. S. Ct. R. 341(h)(7) (eff. May 25, 2018)) but falls short of presenting what we would consider a complete analysis. *E.g.*, *People v. Robinson*, 2013 IL App (2d) 120087, ¶ 15 ("appellant must present *clearly defined* issues to the court, supported by relevant authority; the court is not simply a repository into which appellants may dump the burden of argument and research" (emphasis added and internal quotation marks omitted)).

¶ 73 In imposing consecutive sentences, the trial court should "sparingly" exercise its discretion (*People v. O'Neal*, 125 Ill. 2d 291, 298 (1988)) and do so only after finding consecutive sentences necessary to protect the public from future criminal conduct. 730 ILCS 5/5-8-4(c)(1) (West 2016). The trial court balances mitigating factors and rehabilitative potential against the need to protect the public. *O'Neal*, 125 Ill. 2d at 298-301; see also *Buckner*, 2013 IL App (2d) 130083, ¶ 36.

¶ 74 We see a pattern of rapid reoffending. Hardy committed the offense against T.C. one week after the offense against X.D. On a day in between these attacks, Hardy followed another woman until she retreated into a gas station. The presentence investigation report (PSI) indicates two juvenile adjudications for criminal sexual assault and eight pending charges for public indecency. Based on Hardy's offense history alone, we could say that the trial court properly used its discretion in imposing consecutive sentences to protect the public. At sentencing, the State directed the trial court to disciplinary records from the Cook County Department of Corrections, showing 26 instances of discipline involving acts of a sexual nature. Even while incarcerated, Hardy behaved inappropriately.

¶ 75 Hardy's argument acknowledges this "significant evidence in aggravation at sentencing" and, instead, focuses on the evidence he sees as mitigating. He points out that he committed the offenses during the day and in the presence of witnesses as evidence of the impetuousness and irrationality of his acts. He could easily have been caught. The State relies on these facts as evidence of Hardy's brazenness and willingness to commit offenses, despite the relative risk to him. This dispute involves a quintessential example of the weighing of evidence that trial

- 13 -

courts do and we avoid. *E.g.*, *People v. Branch*, 2018 IL App (1st) 150026, ¶ 38 (citing *People v. Busse*, 2016 IL App (1st) 142941, ¶ 20). It would be particularly inappropriate to reweigh these facts, as the trial court expressly found that "[t]he fact that it was daylight, out in the open, in the presence of other witnesses" should have had, but did not have, a deterrent effect.

¶ 76    Hardy then repeats the arguments he made in the trial court about his relatively young age (25) at the time of the offenses, his absent father, his lack of education, and his employment history. The trial court expressly acknowledged these arguments, and as the State points out, the trial court may find the circumstances of the offense outweigh the mitigation presented. *People v. Alexander*, 239 Ill. 2d 205, 214-15 (2010) (finding appellate court improperly "reweighed the sentencing factors, overemphasizing the mitigating factors while minimizing aggravating factors").

¶ 77    Finally, Hardy cites evidence of his poor mental health. He details reports from the Cook County Department of Corrections (CCDOC), showing that he repeatedly engaged in instances of self-harm or attempted self-harm because he felt helpless or unable to control his surroundings. The State briefly claims this argument was forfeited because Hardy failed to raise his mental health as mitigating in the trial court; yet mere pages later in its brief, the State insists the trial court "noted that it had specifically 'considered all of the exhibits,' *including the CCDOC reports*." (Emphasis added). We reject the State's forfeiture argument as contrary to its own merits argument. We note the State argues that Hardy waived any reliance on plain error by failing to make the argument in his opening brief, a patently frivolous argument we have repeatedly rejected. *E.g.*, *People v. Williams*, 193 Ill. 2d 306, 348 (2000); *People v. Minter*, 2015 IL App (1st) 120958, ¶ 55 n.1 ("It is well established that plain error may be raised for the first time in a reply brief.").

¶ 78    On the merits, the trial court need not consider poor mental health as mitigating. *People v. Coleman*, 183 Ill. 2d 366, 406 (1998). And the evidence in the record about Hardy's mental state is less than conclusive. For example, Hardy directs us to an instance in which he attempted suicide in prison, but a review of the incident report paints a murky picture. Officers reported that Hardy got "a bed sheet *** and proceed[ed] to tie the sheet loosely around his neck." Immediately before this, however, his request to an officer for "some commissary" had been denied, and he told the officer, "[O]k then I got something for yo[ur] b*** a***, I'm gonna make you do some paperwork." The trial court could reasonably conclude that Hardy's "attempts" at suicide were not genuine efforts to end his own life but plans to inconvenience correctional officers.

¶ 79    Finally, when it comes to consecutive sentences, we must determine whether the trial court adequately considered mitigation on the issue of Hardy's future dangerousness to the public. For those purposes, evidence of mental illness leading to an inability to control his actions seems to weigh *against* Hardy, not in his favor. In light of the standard of review, and all of the evidence we have discussed, the trial court acted appropriately and within its discretion regarding the consecutive sentences.

¶ 80    Next, we consider the term of years, starting with whether the trial court properly imposed extended term sentences. Neither party disputes, and we agree, that Hardy's 2006 juvenile adjudication for sexual assault qualifies him for discretionary extended term sentences. See 730 ILCS 5/5-5-3.2(b)(7) (West 2016). Again, Hardy does not mount much of an argument. In light of his statutory eligibility for an extended term, and given the evidence already

discussed, we find the trial court did not abuse its discretion in sentencing Hardy using the extended term sentencing range.

¶ 81     The last question is whether the 25-year sentences are excessive. The sentences are close to the maximum extended range of 15 to 30 years. See *id.* § 5-4.5-30(a). Illinois courts repeatedly describe the seriousness of the offense as the most important sentencing consideration. *E.g.*, *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123 (seriousness of offense is "most important sentencing factor"). Missing from these pronouncements is any discussion of the Illinois Constitution, which sets the goal of rehabilitation on equal stature with the seriousness of the offense. Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined *both* according to the seriousness of the offense *and* with the objective of restoring the offender to useful citizenship." (Emphases added.)).

¶ 82     The trial court imposed 25-year sentences based on its view of the seriousness of the offense. The court specifically relied on the victim impact statements and found Hardy's repeated conduct as brazen, since he committed both offenses in broad daylight in the presence of witnesses. We concur in the conclusion that Hardy's offenses were serious. Nevertheless, the trial court expressly found that Hardy was "*not* a bad person but [had] made bad choices." The court went on to say that it "would never close out the potential for an individual for rehabilitation."

¶ 83     Hardy's combined 50-year sentence means he may stay incarcerated until he nears 80. This offers him little to no opportunity to be "restor[ed] *** to useful citizenship." See *id.* We find the combined 50-year sentence fails to account for the trial court's finding that Hardy had potential for rehabilitation and constitutes an abuse of discretion.

¶ 84     As to remedy, Hardy asks that we "reduce one or both of [his] sentences, order that they be served concurrently rather than consecutively, or remand with instructions as to an appropriate sentence." He does not suggest a target sentence. The State says nothing of remedy in its brief.

¶ 85     We have the authority to impose a new sentence when we find the trial court abused its discretion. *People v. Jones*, 168 Ill. 2d 367, 378 (1995); Ill. S. Ct. R. 615(b)(4) (eff. Jan. 1, 1967). We use this power " 'cautiously and sparingly,' " considering "all of the surrounding circumstances of each particular case," including (i) whether there was additional evidence to offer on remand, (ii) whether the proof presented to the trial court the first time was "relatively straightforward and uncomplicated," and (iii) whether remand for resentencing would unnecessarily burden the court and the parties. *Jones*, 168 Ill. 2d at 378.

¶ 86     We find all of these factors weigh in favor of imposing a new sentence without remand. Neither party indicated that the sentencing record is incomplete or would need supplementing with new information. And the evidence at sentencing was straightforward. The trial court had the PSI, the victim impact statements (which were read into the record), the testimony of one detective to establish Hardy's commission of a 2006 offense, records from the Cook County Department of Corrections, Hardy's allocution, and the arguments of the parties. Finally, in light of the COVID-19 pandemic, a remand for resentencing would be burdensome. While the Cook County circuit court substantially reopened July 6, 2020, sentencing hearings are not among the criminal proceedings receiving priority. Cook County Cir. Ct. Gen. Admin. Order 2020-02 (June 26, 2020). Considering the situation, we impose a new sentence without remand.

¶ 87     We find that an extended term sentence of 15 years in each case, to run consecutively for a total of 30 years, adequately reflects the trial court's findings about the seriousness of Hardy's

offenses. Guaranteeing release by age 58 offers Hardy an opportunity for rehabilitation, which the trial court expressly found a possibility. In dissent, Justice Pierce disagrees that this is an appropriate case to modify a sentence without a remand, but it is not true that only the trial court can modify a defendant's sentence. The Illinois Supreme Court, through its rules, has expressly vested reviewing courts with the ability to modify a sentence: "On appeal the reviewing court may *** reduce the punishment imposed by the trial court." Ill. S. Ct. R. 615(b)(4). Reasonable minds may, and in this case do, disagree about *when* to exercise that power, but to suggest that we lack that power at all is simply incorrect.

¶ 88 We commend the trial court for its comparatively detailed sentencing findings that invaluably aided our review. Criminal sentencing is one of the most challenging and life-altering decisions a circuit court judge makes. With matters so fundamental to liberty, a dialogue between sentencing and reviewing courts contributes mightily to a fair, transparent, and accountable legal system.

¶ 89 Affirmed as modified.

¶ 90 PRESIDING JUSTICE WALKER, concurring in part and dissenting in part:

¶ 91 I respectfully concur in part and dissent in part. To better present the issues in the trial court and the issues on appeal, I restate the facts.

¶ 92 Before 9 a.m. on July 31, 2014, X.D. walked to the CTA Orange Line station near 35th Street. As she crossed a parking lot, a man attacked her from behind, lifting her dress and pulling at her underwear. X.D. fell, screaming. Francisco Cruz and James Drougas, who worked at nearby shops, approached. The attacker ran off. X.D. described the attacker to police as a tall, slender Black man with cornrows and a goatee. She estimated his height at 6 foot, 3 inches. Cruz described the man as having braided hair.

¶ 93 At approximately 8 a.m. on August 8, 2014, Zulma Garza was walking on 36th Street when she saw a man walking in the opposite direction and on the opposite side of the street. She remembered the man as having walked up behind her in a way she found threatening only four days earlier, on August 4, 2014. When she saw the man on August 8, she walked quickly to a nearby school where her brother, Milton Garza, and her cousin, Homero Gutierrez, worked. When she told them of her fear, Milton and Gutierrez went out to look for the man she described. Although they saw him, they could not catch up to him. They were on their way back to the school when they saw him walk up behind a young woman as she walked out from under a viaduct. The man shoved the woman to the ground. Gutierrez called police, and Milton and Gutierrez ran over and chased the attacker but did not catch him. The young woman, T.C., described the attacker to police as a young Black man with a dark complexion, near 6 feet tall, about 150 pounds, with brown eyes and black dreadlocks. Gutierrez described the attacker as a lean young Black man, more than 6 feet tall, with dreadlocks and a goatee.

¶ 94 Officer Chris Hackett heard the descriptions and cruised around the area of the attack on August 8, 2014. At approximately 10 a.m., Hackett arrested Hardy about three blocks from the scene of the attack on T.C. Hardy, a 25-year-old Black man with a goatee and a mustache, stood 6 foot, 2 inches tall, weighed 175 pounds, and wore his hair in dreadlocks that hung down several inches on both sides of his head.

¶ 95     Police arranged a lineup for Hardy's possible identification as the man who attacked T.C. and as the man who attacked X.D. The lineup included three other men, all black and all with some facial hair. Two stood about 6 feet tall, while the third man was at least half a foot shorter. The shorter participant wore his hair cut very close to his head. Another participant had stubble covering his mostly bald head, and the third of the fillers in the lineup had hair that extended no more than an inch from his head. None of the fillers wore dreadlocks. Cruz, Drougas, T.C., Gutierrez, Zulma, and Milton all separately viewed the same lineup on August 8, 2014. All dutifully identified the person with dreadlocks as the man who attacked X.D. on July 31, 2014, and T.C. on August 8, 2014. Prosecutors charged Hardy with the attempted aggravated criminal sexual assault on X.D. on July 31, 2014, and the attempted aggravated criminal sexual assault on T.C. on August 8, 2014.

¶ 96     The trial court granted the prosecution's motion to permit the use of evidence of each of the crimes in the prosecution of the other offense. Defense counsel agreed to have both charges tried in a single jury trial.

¶ 97     The prosecution presented no physical evidence tying Hardy to either crime. The jury needed to decide only whether the three witnesses correctly identified Hardy as the man who attacked X.D., and whether the other four witnesses correctly identified Hardy as the man who attacked T.C.

¶ 98     X.D. testified that on July 31, 2014, as she walked under a viaduct on her way to the CTA Orange Line station, she noticed a man walking in the opposite direction on the other side of the street. A few minutes later, that man pushed her from behind, and she fell on her knee. She tried to get up, and he pushed her down again. This time she fell on her back, getting a good look at her attacker's face from a few feet away. On August 22, 2014, police showed her a photo array of pictures of the faces of six Black men who wore dreadlocks and facial hair. She identified Hardy's photo as the picture of the man who attacked her. She identified Hardy in court as the man who attacked her.

¶ 99     Cruz testified that, on the morning of July 31, 2014, he watched a man going back and forth by the viaduct, which was 50 feet away from Cruz. Cruz looked up when he heard a scream and saw that man attacking X.D. Cruz came within 25 feet of the attacker before the attacker escaped, and Cruz saw the attacker's face several times when the attacker looked back as Cruz chased him. Cruz identified Hardy in the lineup and in court as the man who attacked X.D. Cruz testified that X.D. wore a cream-colored skirt on the morning of the attack.

¶ 100    Drougas testified that X.D. wore a blue dress on July 31, 2014. Drougas saw the attacker approach X.D. from behind and lift her dress. Drougas yelled and ran to X.D., chasing the attacker away. Drougas saw X.D. fall face first; he did not see X.D. fall on her back or part of the attack after X.D. fell into tall grass. Drougas estimated that he saw the attacker for perhaps 30 seconds before the brief attack. Drougas identified Hardy in the lineup and in court as the man who attacked X.D.

¶ 101    T.C. testified that she first noticed the man who attacked her when he walked past her going in the opposite direction near the viaduct. When he pulled her down and yanked her clothes, she saw his profile up close. She could not see much during the 30 seconds she struggled with him. T.C. identified Hardy in the lineup and in court as the man who attacked her.

¶ 102    Zulma testified that she saw Hardy on August 4, 2014, when he suddenly came up very close to her from behind. She saw him for perhaps 30 seconds on the street before he approached her from behind on that day, but she was sure she saw Hardy again from 30 feet

- 17 -

away on August 8. Based on the encounter on August 4, she changed direction to find her brother and her cousin as quickly as possible.

¶ 103    Gutierrez testified that, on his way to work on August 8, 2014, he passed Hardy on the street and saw his face for 10 seconds. After Zulma came to the school, Gutierrez saw Hardy again from about half a block away. Gutierrez saw Hardy during the attack on T.C. from 20 feet away before Hardy ran off. Milton testified that he saw the man who scared Zulma and attacked T.C. for about 15 seconds from a distance. He identified Hardy in court as the man who attacked T.C.

¶ 104    The jury found Hardy guilty of both charges of attempted aggravated criminal sexual assault, and the court sentenced Hardy to two consecutive sentences of 25 years each.

¶ 105    On appeal, Hardy argues that he received ineffective assistance of counsel when his attorney failed to move to suppress both the evidence that the witnesses identified Hardy in the lineup and the in-court identification testimony resulting from the suggestive lineup. When a defendant bases an ineffective assistance claim on counsel's failure to file a suppression motion, "the defendant must show that a reasonable probability exists both that the motion would have been granted, and that the result of the trial would have been different had the evidence been suppressed." *People v. Henderson*, 2013 IL 114040, ¶ 12.

¶ 106    The lineup had four participants and only one with hair more than an inch long. This lineup was performed even though the long-braided hair—described as dreadlocks, cornrows, and braids—was the most notable identifying characteristic of the attacker. The majority reasonably assumes that Hardy could show that a motion to suppress the lineup identifications would have had merit. See *People v. Clifton*, 2019 IL App (1st) 151967, ¶¶ 62-63.

¶ 107    Hardy contends that the court should have suppressed all testimony identifying Hardy in court as the attacker based on the extremely suggestive lineup. Once a defendant establishes that police held an impermissibly suggestive lineup, the court may still admit the testimony identifying the defendant as the offender if "the State *** [makes] a clear and convincing showing, based on the totality of the surrounding circumstances, that the witness is identifying the defendant solely on the basis of his memory of events at the time of the crime" (internal quotation marks omitted) (*People v. McTush*, 81 Ill. 2d 513, 520 (1980)) and not because the police used an unfair lineup to suggest the identification of the defendant as the offender. The *McTush* court set out factors for the trial court to consider in determining "whether the suggestive procedure created a substantial risk of misidentification, without a sufficient, separate basis of reliability." *Id.* at 521. The court stated,

> "The factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.*

¶ 108    Hardy points out that courts in other jurisdictions have adopted more complete lists of factors to consider, in light of studies concerning the unreliability of eyewitness identification testimony. The leading case on the issues, with an extensive account of the studies, is the New Jersey Supreme Court's decision in *State v. Henderson*, 27 A.3d 872 (N.J. 2011). The *Henderson* court established for New Jersey the following list of factors for a trial court to add to the *McTush* factors when determining the reliability of identification testimony following suggestive lineup identifications:

"1. *Stress*. Did the event involve a high level of stress?

2. *Weapon focus*. Was a visible weapon used during a crime of short duration?

3. *Duration.* How much time did the witness have to observe the event?

4. *Distance and Lighting*. How close were the witness and perpetrator? What were the lighting conditions at the time?

5. *Witness Characteristics*. Was the witness under the influence of alcohol or drugs? Was age a relevant factor under the circumstances of the case?

6. *Characteristics of Perpetrator*. Was the culprit wearing a disguise? Did the suspect have different facial features at the time of the identification?

7. *Memory decay*. How much time elapsed between the crime and the identification?

8. *Race-bias*. Does the case involve a cross-racial identification?" *Id.* at 921-22.

Our supreme court has not adopted the *Henderson* factors. However, the court has not forbidden lower courts from considering research concerning the reliability of eyewitness identification testimony. Hence, I would consider the research cited in *Henderson* when determining whether it is proper to admit into evidence identification testimony following an impermissibly suggestive lineup.

¶ 109 Here, all the witnesses testified that they saw the attacker for less than a minute at the time of the attack. Milton stated that he watched the attacker walk back and forth near a viaduct about 50 feet away from Milton for some time before the attack. Others saw the attacker for 10 to 30 seconds before the attack. The witnesses other than the victims came within 20 feet or so of the attacker as they chased him away, and they saw him in daylight, but in a situation of considerable stress. The witnesses had not ingested alcohol or drugs. A few hours elapsed between the attack and the highly suggestive lineup for four of the witnesses; one week elapsed between the incident and the lineup for the other three witnesses. Three years elapsed from the suggestive lineup to the in-court identifications. The witnesses described the attacker in fair detail, and the descriptions matched Hardy reasonably well. All the witnesses expressed certainty in both the lineup and the in-court identifications.

¶ 110 The identification testimony from X.D., who chose Hardy's picture from a photo array and never saw the highly suggestive lineup, would remain admissible, even if counsel had moved to suppress the lineup identifications. See *People v. Littleton*, 2014 IL App (1st) 121950, ¶ 85. In view of the other witnesses' limited opportunities to see the attacker, I would find Hardy has raised a meritorious issue, a "serious question" (*Jones v. Phipps*, 39 F.3d 158, 165 (7th Cir. 1994)) as to whether the State showed by clear and convincing evidence that the witnesses would have identified Hardy in court as the attacker if the police had not so openly suggested that identification. If the court had suppressed the identifications of Hardy as the attacker made by all the witnesses except X.D., the prosecution would have, as to T.C., evidence only that (i) X.D. suffered a similar attack by Hardy a week before the attack on T.C. near the location of the attack on T.C., and (ii) Hackett arrested Hardy, who matched the descriptions of the man who attacked T.C., near the scene of that attack about an hour after the attack. Hence, I would find a reasonable probability that Hardy would have received a better result but for counsel's failure to file a motion to suppress evidence of the lineup and in-court identifications of Hardy as the man who attacked X.D. and T.C. I would find that Hardy has shown that he received ineffective assistance of counsel. Accordingly, I respectfully dissent from the decision to

affirm the conviction. However, to avoid a total injustice, I concur in the decision to reduce the sentences. See *People v. Glenn*, 417 N.Y.S.2d 934 (N.Y. App. Div. 1979) (the published report notes that the dissent would reverse the conviction and remand for a new trial but concurs in the reduction of the sentence), *rev'd on other grounds*, 418 N.E.2d 1316 (N.Y. 1981).

¶ 111     JUSTICE PIERCE, concurring in part and dissenting in part:

¶ 112     I agree that defendant's conviction must be affirmed because the defendant suffered no prejudice from counsel's alleged deficiencies on the severance issue and a successful motion to suppress the lineup identifications would not have changed the result. The outcome of the trial would not have been different had counsel successfully moved to sever the cases and suppress the lineup identifications. If there had been separate trials, the evidence in both trials would be substantially the same. Any alleged deficiency in the identification testimony from any witness was developed during the trial, and the jury made unanimous decisions of guilt beyond a reasonable doubt after hearing from the witnesses and judging the credibility of their testimony in light of each witness's ability and opportunity to observe the defendant's criminal conduct. Defendant unequivocally received effective assistance of counsel and a fair trial.

¶ 113     However, I respectfully disagree with the determination that defendant's extended consecutive 25-year sentences are excessive or the result of an abuse of discretion by the trial court, and I would therefore affirm defendant's sentences. And, even if the defendant was entitled to a resentencing, which he is not, it is inappropriate for the appellate court to impose a new sentence because that is the function of the trial court. Imposition of two 15-year consecutive year sentences would have the effect of depriving the trial court of the legislative grant of discretion to impose an extended sentence, which, again, is something the appellate court cannot do. If defendant's sentences are excessive, which they are not, the correct procedure is to remand to the trial court for resentencing, not for the appellate court to impose the new sentence. Justice Hyman compliments the trial court on the detail of the court's sentencing remarks yet interprets these remarks to find that the circuit court imposed the extended 25-year sentences based primarily on its view of the seriousness of the offense without due consideration of defendant's rehabilitative potential, as required by the Illinois Constitution. Ill. Const. 1970, art. I, § 11 ("All penalties shall be determined *both* according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." (Emphasis added.)). I disagree with that interpretation.

¶ 114     Frequently, an appellate court justice may review a sentence that is more than the justice would have imposed had he heard the case. But we are not given the authority to impose the sentence we like. The standards that limit our review of the sentence imposed are well known. A trial court has broad discretionary powers in choosing the appropriate sentence a defendant should receive. *People v. Jones*, 168 Ill. 2d 367, 373 (1995). A reasoned judgment of the sentence to be imposed must be based upon the circumstances of each individual case and other factors, including the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *People v. Perruquet*, 68 Ill. 2d 149, 154 (1977). "In determining an appropriate sentence, the defendant's history, character, rehabilitative potential, the seriousness of the offense, the need to protect society and the need for deterrence and punishment must be equally weighed." *People v. Jones*, 295 Ill. App. 3d 444, 455 (1998). There is a strong presumption that the trial court based its sentencing determination on proper

legal reasoning, and the court is presumed to have considered any evidence in mitigation that is before it. *People v. Partin*, 156 Ill. App. 3d 365, 373 (1987). The imposition of a sentence is a matter within the trial court's discretion, and a reviewing court has the power to disturb the sentence only if the trial court abused its discretion. *Jones*, 168 Ill. 2d at 373-74.

¶ 115    There is nothing in this record that remotely suggests that the trial court abused its discretion in this case. As Justice Hyman acknowledges, defendant's 50-year sentence fell within the authorized statutory range of imprisonment and is therefore presumptively proper. *People v. Gutierrez*, 402 Ill. App. 3d 866, 900 (2010). In addition, Justice Hyman acknowledges that before imposing sentence, the trial court thoroughly went over the factors in aggravation and mitigation and considered the presentence investigation report. See 730 ILCS 5/5-5-3.1, 5-5-3.2 (West 2016). This clearly indicates the level of thought and deliberation used in fashioning defendant's sentences.

¶ 116    Defendant admits and concedes that there was "significant evidence in aggravation at sentencing." Again, Justice Hyman acknowledges that Hardy is a repeat sexual offender who committed the offense of attempted aggravated criminal sexual assault against T.C. one week after he committed the offense of attempted aggravated criminal sexual assault against X.D. In between these attacks, Hardy followed another woman until she safely retreated into a gas station. The circuit court heard testimony that defendant committed these attacks during the day, in the presence of witnesses, which demonstrated his brazenness and willingness to commit these offenses, despite the relative risk of being caught and prosecuted. The court also knew defendant's age (25) at the time of the offenses, his absent father, his lack of education, his employment history, and his poor mental health. The PSI showed that defendant had juvenile adjudications for criminal sexual assault and eight pending charges for public indecency. The State also introduced disciplinary records from the Cook County Department of Corrections, showing that Hardy was involved in 26 disciplinary instances of involving acts of a sexual nature, information that does not indicate that defendant is a good candidate for rehabilitation.

¶ 117    As Justice Hyman noted, in imposing sentence, the trial court indicated that it would "never close out the potential for an individual for rehabilitation." Nevertheless, the trial court emphasized that "having regard for the nature and circumstances of the offense and the history and character of [Hardy], it is [the trial court's] opinion that consecutive sentences are required to protect the public from further criminal conduct," given the brazenness of the attacks.

¶ 118    The potential for rehabilitation need not be given any greater weight than the seriousness of the offense. *People v. Sharpe*, 216 Ill. 2d 481, 525 (2005). It is clear from the record that the court properly considered both the seriousness of the offenses and Hardy's potential for rehabilitation. I view the court's comment as indicative of the court having considered Hardy's rehabilitation potential (by "never [closing] out the potential for an individual for rehabilitation") and rejecting that potential in view of what the trial court heard and its familiarity of the defendant's demeanor during the pendency of the case before him. Based on the offenses before the court, sexually attacking two women in broad daylight, along with Hardy's history of involvement in crimes and disciplinary actions of a sexual nature, the experienced trial judge found that it was necessary to protect the public from further criminal conduct by this defendant. In light of the facts of this case and in light of the mitigating and aggravating circumstances, and because the legislature has given the sentencing court the discretion to impose consecutive extended terms of up to 30 years on each conviction, there is

no abuse of discretion here. This may not be the sentence Justice Hyman, or I, would have imposed. But it is an authorized sentence. There is nothing that remotely justifies a sentence reduction, let alone a sentence reduction imposed by the appellate court. The trial court properly exercised its discretion in sentencing defendant to two extended consecutive terms of 25 years' imprisonment. Hardy's sentence is authorized by law and is not excessive. The sentences imposed should be affirmed.

¶ 119 Finally, Justice Walker has stated his reasons for reversing this conviction. I do not believe that, in doing so, he retains the option of concurring in the reversal of the sentences imposed by the trial court and the imposition of reduced sentences by the appellate court. He has decided the conviction should not stand, and his view on the appropriate sentence matters not.

¶ 120 For these reasons, defendant's convictions and sentences should be affirmed.