2025 IL App (1st) 231924-U

No. 1-23-1924

Order filed March 10, 2025

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 8975 |
| | ) | |
| DEON MOORE, | ) | Honorable |
| | ) | Steven J. Goebel, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE FITZGERALD SMITH delivered the judgment of the court.
Justices Pucinski and Cobbs concurred in the judgment.

**ORDER**

¶ 1    *Held*:   We affirm defendant's sentence where the trial court did not abuse its discretion by imposing discretionary consecutive sentences to protect the public from further criminal conduct by defendant.

¶ 2    Following a bench trial, defendant Deon Moore was convicted of involuntary manslaughter and unlawful use or possession of a weapon by a felon (UUWF) and sentenced to consecutive terms of 14 and 13 years in prison, respectively. On appeal, he contends the court abused its discretion in imposing discretionary consecutive sentences. We affirm.

¶ 3    Defendant was charged by indictment with several counts of first degree murder for shooting and killing Larry Moore, UUWF premised on possessing a firearm, and UUWF premised on possessing firearm ammunition.[1]

¶ 4    At trial, the State's evidence showed that, on Sunday, May 21, 2017, Larry was found dead sometime after 12:40 p.m. in a room at a Motel 6 in Elk Grove Village, Illinois. He had injuries to his face and the back of his head and a hole in his neck. Beer cans and a bottle of liquor were scattered throughout the room.

¶ 5    Debra Moore, Larry's mother and defendant's aunt, testified that Larry lived at the Motel 6 for a little over a year. Between approximately 5:30 p.m. and 6:30 p.m. on May 21, 2017, detectives told her that Larry was dead from a gunshot. She then called family members and told her daughter, Tomorrow Moore, that Larry was dead.[2] Defendant called Debra around 7:30 p.m., stating he would be at her house in about an hour. She did not tell him how Larry died. Family, including defendant, gathered at her home that evening and she shared what the police had told her. Defendant said he had not seen Larry for a few days and tried calling him, but defendant thought his number was blocked. He also said Larry had a date planned with a woman who was coming to his room and "[t]hat's probably what happened to him." Defendant said that "people get away with murder every day in Chicago."

---

[1] As defendant, the victim Larry Moore, and many of the witnesses share a surname, we will refer to those individuals by their first names.

[2] The record on appeal includes a written stipulation to the testimony of Debra's daughter in which her first name is spelled "Tomorrow." It is also spelled "Tamara" and "Tamaro" throughout the record.

¶ 6 On May 22, 2017, detectives showed Debra still images from inside the Motel 6, and she identified Larry and defendant. She identified the images at trial and they are included in the record on appeal.

¶ 7 On cross-examination, Debra agreed that Larry had an alcohol problem and could get "aggressive" "[w]ith his mouth" when he drank.

¶ 8 The parties stipulated to the testimony of four of defendant and Larry's family members. Clarence Washington would testify that he spoke to defendant "on Facetime on Facebook" around 1 a.m. on May 21, 2017, and defendant told him that police officers had found Larry in a motel room dead from a gunshot to his head and defendant did not know who killed him. Robert Moore would testify that, after learning of Larry's death from Debra the evening of May 21, 2017, Robert called defendant, who said he did not know what happened to Larry.

¶ 9 Jessie Freddy Moore, Larry's brother, would testify that he spoke with defendant on the phone around 8 p.m. on May 21, 2017, and asked what happened to Larry. Defendant first stated he left the motel on Friday night but later said he left Saturday night. Defendant said that Larry planned to have a woman come over on Saturday night and that it was "messed up" that Larry was shot in the head. Jessie asked how defendant knew Larry was shot in the head, and defendant said that Debra told him.

¶ 10 Tomorrow, Larry's sister, learned of Larry's death around 7 p.m. on May 21, 2017, and went to Debra's home around 7:30 p.m. Defendant arrived around 9:30 p.m. and said that he had been with Larry around midnight or 1 a.m., Larry planned to meet a woman, someone picked up defendant around 1:30 a.m., and someone had blocked defendant's number on Larry's phone.

¶ 11    Elk Grove Village police investigator Michael McIntyre testified that, after investigators spoke with Debra, he began looking for defendant. On May 22, 2017, McIntyre viewed surveillance videos from the Motel 6 showing defendant and Larry in the motel the evening of May 19, 2017, and defendant on May 20, 2017. McIntyre spoke with defendant by phone around 5 p.m. on May 22, 2017, and, along with other investigators, picked up defendant in Chicago and drove him to the Elk Grove Village police station. At the police station, McIntyre and another officer interviewed defendant.

¶ 12    The State published defendant's three recorded interviews with the police, which were entered into evidence and are included in the record on appeal. We have viewed the recorded interviews and recount defendant's statements.

¶ 13    In the first interview, beginning between 8 p.m. and 8:30 p.m. on May 22, 2017, defendant initially maintains that a woman picked him up from the motel the early morning, around midnight, of Saturday, May 20, 2017. A woman Larry had met online planned to visit Larry. Later that morning, defendant texted Larry and received notifications indicating Larry had blocked him. The officers ask defendant to unlock his cell phone and defendant repeatedly enters an unsuccessful password. They state that they spoke to the woman whom defendant said had picked him up, and she denied picking him up. Defendant states she is probably lying out of fear. The officers show him still images from the Motel 6, and he denies that he is a person depicted leaving a room around 11 a.m.

¶ 14    About five and a half hours after the interview began, the officers urge defendant to be truthful, and defendant then repeatedly states it was an "accident." He and Larry had been drunk. Larry mentioned that he missed a woman who had previously called the police to the motel while

defendant was there and in possession of a firearm, which risked defendant going to prison. Defendant and Larry began to argue, and Larry claimed that defendant's ex-girlfriend had left defendant for a woman. Larry got "real loud." Defendant told Larry to be quiet so the police would not be called, and Larry said he did not care. Defendant told Larry to "be cool," and Larry said, "Or what?" which "violated [defendant's] manhood."

¶ 15   Defendant had been sitting on one of the beds and Larry was in a chair. Defendant agrees that the argument "escalated," and he states that Larry began to "toughen up." Defendant agrees that if they fought with their fists, the police would arrive, and he had a firearm. He drew the firearm from his bag, stood, and hit Larry in the face with it to "knock him out" and quiet him. The firearm discharged as he struck Larry. Defendant initially did not realize Larry was shot but Larry slumped in his chair and to the ground between the two beds and the dresser, where photographs of the room show he was found. Defendant did not mean to kill Larry.

¶ 16   Defendant felt "bad" but also did not feel bad, because it was an accident. He did not call 911 as Larry was "gone." Defendant called his ex-girlfriend and told her that he had accidentally killed Larry. He called another woman and asked for a ride, but she declined. Around 11 a.m., he walked about an hour to a bus stop, took the Pace bus to a CTA station, CTA trains to a beach near Pratt Boulevard and Sheridan Road, in Chicago, and threw the firearm off a pier into Lake Michigan. He had purchased the firearm on the street "[m]onths ago," and always carried it or kept it somewhere accessible.

¶ 17   In the second interview, the following morning, the officers indicate that they have spoken with the Chicago police marine unit about searching the lake for the firearm. Defendant states that

he believes he will spend "the rest of [his] life" in prison and swears that he threw the firearm in the lake.

¶ 18    In the third interview, beginning around 9 p.m. on May 23, 2017, defendant states he believed that someone would call the police if he and Larry had fought with their fists, and agrees that, if that happened, the police would eventually search the motel room. He explains again that he tried to knock Larry out and shut him up by striking him with the firearm. He did not purposely put his finger on the trigger. He repeatedly demonstrates how he removed the firearm from a bag on the ground to his left as he sat at the foot of a bed and swung it at Larry, and how Larry slumped to his right and out of his chair. He denies knowing how the back of Larry's head was injured, and states that if he had struck Larry twice, the killing would have been intentional. McIntyre tells defendant that officers had searched Lake Michigan where defendant had described throwing the firearm, and defendant states that he lied about throwing the firearm in the lake and left it on a CTA train. He repeats that the shooting was a tragic accident, and he believes he will spend the rest of his life in prison.

¶ 19    The State published surveillance clips from the Motel 6 and Pace bus. They are included in the record on appeal and depict defendant and Larry entering a room in the motel around 11:50 p.m. Around 1:17 a.m. and 3:07 a.m., defendant briefly steps out of the room, then reenters it. Around 11 a.m., he exits the room carrying two bags. Around 12:17 p.m., he enters the Pace bus and exits around 12:36 p.m. McIntyre testified that there was no surveillance footage available from the CTA trains.

¶ 20    Dr. Adrienne Segovia, an assistant medical examiner, testified that she reviewed reports of Larry's autopsy and opined that Larry died by homicide from a gunshot wound to the left side of

his neck. The wound was angled and the bullet was fired from less than an inch away. The bullet traveled from left to right and downward. Larry would have died within minutes. Dr. Segovia testified that the bullet's downward trajectory could have occurred if the shooter was standing and Larry was sitting or if Larry was leaning into the direction of the bullet.

¶ 21    Larry also suffered blunt force injuries to the back of his head and mouth, which could have been caused by being struck with a firearm. Larry's blood alcohol level was 0.217. Dr. Segovia had reviewed defendant's statement indicating he had struck Larry in the face while he rose and Larry was seated, and that the firearm discharged. The injuries to Larry's face and the gunshot wound could be consistent with defendant's account if Larry had been moving upward and turning towards his right to expose his neck when he was struck in the mouth. Dr. Segovia agreed those would be "very particular circumstances."

¶ 22    The parties stipulated that defendant was previously convicted of unlawful use of a weapon.

¶ 23    Following argument, the court found defendant guilty of first degree murder and both counts of UUWF. Defendant filed a motion to reconsider the finding of guilt for murder and enter a finding of involuntary manslaughter. Following argument, the court reduced the finding to involuntary manslaughter, determining that defendant did not have the mental state to commit first degree murder.

¶ 24    Defendant's presentence investigative report (PSI) reflected that he was 34 years old at the time of the offense and had a 4-year-old daughter. The PSI listed the following convictions: (1) unlawful use of a weapon and manufacture or delivery of a controlled substance in 2002 for which he was sentenced to 4 years in prison, (2) a federal charge of possessing a weapon in 2007 for

which he was sentenced to 41 months in prison, (3) resisting or obstructing in 2014 for which he was sentenced to 10 days in jail, and (4) aggravated assault of a peace officer in 2015 for which he was sentenced to 6 months' conditional discharge.

¶ 25    Defendant reported having a problem with alcohol. He had been participating in weekly alcoholics anonymous (AA) meetings while in custody, enjoyed them, and had a sponsor, which had been "a positive life change." He reported that alcohol was the reason for his current situation and he wished he could replay the day of the incident and see Larry again. He denied gang affiliation. He dropped out of school in the ninth grade but hoped to earn his GED.

¶ 26    At the sentencing hearing, Larry's sister Fidelity Moore gave a victim impact statement. In aggravation, the State referenced defendant's lies to his family and police after Larry's death, and requested the court impose discretionary consecutive sentences to protect the public from future criminal conduct by defendant.

¶ 27    In mitigation, defendant's counsel noted that defendant had attended 104 weekly AA meetings while in jail. Counsel introduced documents demonstrating defendant's participation in the GED program and certificates showing he completed a constitution course, a creative writing class, a second chance program, and a bible study class, and exhibited "Excellent Behavior" in the GED program. Counsel argued that defendant's prior convictions occurred long ago, he now had a child for whom he wanted to provide, he wanted to change his behavior, and this was his only conviction for a violent crime. Defendant wanted to accept responsibility and was severely intoxicated when he struck Larry. As he was sober now, his offense was the result of circumstances that were unlikely to recur. Counsel argued the court should not impose consecutive sentences.

¶ 28    In allocution, defendant said that he never intended for the incident to occur, he was hurt by the negative impact it had on his family, and he was sincerely sorry. He had been rehabilitating himself and his substance abuse.

¶ 29    The court merged the two UUWF counts and sentenced defendant to 14 years in prison for involuntary manslaughter and 13 years in prison for UUWF, to be served consecutively. The court noted it had presided over the trial and stated it had considered defendant's PSI, counsels' arguments, defendant's statement in allocution, the victim impact statement, and the factors in mitigation. The court did not "disregard" what defendant had been doing in jail and found it "excellent." It was "shocked and appalled *** by the level and severity" of defendant's lies and found lying "part of [defendant's] character." The court was unconvinced that Larry died the way that defendant described given his "blatant lies," but based on the medical examiner's testimony and case law, the court found "a reckless act."

¶ 30    The court determined that consecutive sentences were necessary under section 5-8-4(c)(1) of the Unified Code of Corrections (Code) (730 ILCS 5/5-8-4(c)(1) (West 2016)) to protect the public from further criminal conduct by defendant given the nature and circumstances of the offense and defendant's history and character. It believed, based on his background, that defendant had an "affinity for weapons and *** violence." The court doubted defendant would reform his conduct upon release. The court believed defendant lied about leaving the firearm on a train, knew its location, and would obtain or use it again upon release from prison, which "really concern[ed]" the court. The court stated that defendant was "a very extreme danger" to the public at large.

¶ 31    On December 28, 2020, defendant filed *pro se* a petition for relief under the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2020)), claiming that his trial counsel

was ineffective for failing to file a motion to reconsider the sentence or a notice of appeal, and the court erred in imposing consecutive sentences. The court ultimately granted the petition by agreement and allowed defendant leave to file a late notice of appeal from his convictions.

¶ 32    On appeal, defendant challenges his sentence, arguing that consecutive sentences were unnecessary to protect the public, and the court failed to consider mitigating evidence and his potential for rehabilitation. He disagrees with the court's conclusions that he had affinities for lying and violence, the offense did not necessarily occur as defendant described, and defendant knew the firearm's location and could retrieve it. Defendant requests this court to either order the sentences to run concurrently or to remand for a new sentencing hearing.

¶ 33    Initially, defendant acknowledges that he failed to properly preserve this issue for our review. However, he requests we review the issue under the plain error doctrine and for ineffective assistance of counsel given counsel's failure to raise the issue in the trial court.

¶ 34    The plain error doctrine allows this court to review unpreserved sentencing issues when a clear or obvious error occurred and (1) "the evidence at sentencing was closely balanced" or (2) "the error was so egregious that it denied the defendant a fair sentencing hearing." *People v. Hussain*, 2024 IL App (1st) 230471, ¶ 24. Defendant requests review under both prongs. However, the first question is whether a clear or obvious error occurred, as without such error, there is no plain error. *People v. Pacheco*, 2023 IL 127535, ¶¶ 55, 61. Likewise, where there is no error, counsel is not deficient for failing to preserve the issue. *People v. Bannister*, 232 Ill. 2d 52, 79-80 (2008). We find no error here.

¶ 35    Section 5-8-4(c)(1) of the Code provides that the court may impose consecutive sentences "[i]f, having regard to the nature and circumstances of the offense and the history and character of

the defendant, it is the opinion of the court that consecutive sentences are required to protect the public from further criminal conduct by the defendant." 730 ILCS 5/5-8-4(c)(1) (West 2016)). The trial court is not required to use specific language to impose consecutive sentences under the statute. *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 40. The court must balance mitigating factors and the defendant's rehabilitative potential against the need to protect the public. *People v. Hardy*, 2020 IL App (1st) 172485, ¶ 73. Discretionary consecutive sentences should be imposed sparingly. *Id.*

¶ 36    Nevertheless, as the trial court is best positioned to consider the defendant's credibility, general moral character, mentality, social environment, and habits, we review the imposition of consecutive sentences for an abuse of discretion. *People v. Buckner*, 2013 IL App (2d) 130083, ¶ 36. "If the record does not reflect that the trial court took mitigating factors into account, including a defendant's potential for rehabilitation, and the record does not support the trial court's determination that consecutive sentences were necessary to protect the public, an abuse of discretion has occurred." *Id.* In reviewing a sentencing decision, we will not reweigh the evidence. See *Hardy*, 2020 IL App (1st) 172485, ¶¶ 75-76 (declining to reweigh aggravating and mitigating sentencing evidence).

¶ 37    Here, the record supports the court's determination that consecutive sentences were necessary to protect the public and reflects that the court considered the mitigating factors. Thus, the court did not abuse its discretion.

¶ 38    Defendant notes that the court expressed doubt that the instant offense occurred in the manner defendant described. Even if it did occur how defendant described, however, it was a violent offense. According to defendant, he struck his cousin in the face with a loaded firearm. He

purportedly did so because his cousin had "violated" his "manhood" but, if they fist fought, someone would call the police, who might discover his unlawful possession of the firearm. He had already been twice convicted of offenses related to weapon possession. Thus, the instant offense was a violent act committed to, at least in part, avoid an additional firearm possession offense.

¶ 39   Despite the facts of the offense, defendant disagrees that the record shows he has a propensity for violence. He denies that his resisting or obstruction and aggravated assault of peace officer offenses were necessarily violent offenses. Without evidence detailing the circumstances of his prior offenses, however, and given the circumstances of the instant offense, it was not unreasonable for the court to conclude that he had a propensity for violence. Moreover, section 5-8-4(c)(1) allows for consecutive sentences "to protect the public from further criminal conduct by the defendant," which need not necessarily be violent. 730 ILCS 5/5-8-4(c)(1) (West 2016); *Buckner*, 2013 IL App (2d) 130083, ¶ 41 (noting that protecting the public from criminal conduct was "not limited to conduct that results only in physical harm").

¶ 40   Nor was it unreasonable for the court to conclude that defendant had an affinity for weapons and lied about leaving the firearm on the train. While his prior weapon offenses were more than 10 years prior to the instant offense, we fail to see how that shows defendant is unlikely to commit further criminal conduct where he continued to unlawfully possess a firearm even after having served a prison sentence for doing so. Indeed, in defendant's videotaped interview, he states that he always carried the firearm or left it somewhere accessible. He also explained that part of the argument culminating in Larry's death was about Larry missing a woman who had previously called the police to the motel while defendant was there and in unlawful possession of a firearm. His own statements therefore demonstrate that he had repeatedly committed criminal conduct since

his last prison sentence. And, while firearm possession is not inherently violent, had defendant not possessed a firearm during this incident, Larry likely would not have died, demonstrating the reasonableness of the court's desire to protect the public from future firearm possession by defendant.

¶ 41 Further, even after ostensibly telling the truth about the circumstances of the shooting, defendant lied about throwing the firearm in Lake Michigan. Defendant contends that, at the time of the interview, he believed he would spend his life in prison and therefore had no reason to conceal the firearm's location and lie about leaving it on a train, as the court suspected. But the same logic would apply to defendant's lie about throwing the firearm in the lake, which defendant nevertheless made despite having no reason to lie about the location of the firearm.

¶ 42 Given the extent of defendant's known lies to his family and authorities, including denying his identity when confronted with images of him leaving the motel room, it was also reasonable for the court to conclude that lying was part of defendant's character. Defendant disputes that this provided a basis for imposing a consecutive sentence. See *People v. Rucker*, 260 Ill. App. 3d 659, 663-64 (1994) (finding that manipulative tendencies did not support consecutive sentencing to protect the public where the defendant pled guilty and was willing to pay restitution for his crimes). However, it provided the court reason to doubt that defendant was being entirely truthful about what happened to Larry. And, as discussed, even if the offense occurred according to defendant's statement, it was a violent act committed out of concern that he could be caught committing another crime, unlawful possession of the firearm.

¶ 43 Next, defendant argues that the court failed to consider the mitigating evidence. He asserts that (1) the instant offense resulted from defendant's alcohol abuse, which he was remedying with

consistent participation in AA; (2) his long incarceration would negatively impact his daughter; (3) he was working towards his GED and participating in programs in jail; and (4) he expressed remorse for Larry's death in his videotaped interview and at sentencing.

¶ 44    The record shows that the court considered the mitigating evidence. The court stated it had presided over the trial and considered defendant's PSI, his counsel's arguments, and his statement in allocution. It explicitly stated it was not disregarding defendant's rehabilitative conduct in jail, which the court found "excellent." Thus, the record shows that the court considered the mitigating factors defendant now raises, all of which were mentioned in his PSI or during the sentencing hearing, and therefore there was no abuse of discretion at sentencing.

¶ 45    Last, defendant cites several cases in which reviewing courts overturned the imposition of consecutive sentences for offenses that defendant deems "far more serious" than his. Again, we note that, according to defendant, he struck his cousin in the face with a loaded firearm, which discharged and killed him, merely to quiet him down in order to avoid police discovering he was unlawfully in possession of a firearm after having been twice convicted of other weapons offenses. For the reasons already discussed, we find that the court here did not abuse its discretion in finding that consecutive sentences were necessary to protect the public.

¶ 46    As the court did not abuse its discretion in imposing consecutive sentences, no error occurred, and defendant's plain-error and ineffective assistance of counsel arguments must fail. *Pacheco*, 2023 IL 127535, ¶ 61; *Bannister*, 232 Ill. 2d at 79-80. We therefore affirm the court's judgment.

¶ 47    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 48    Affirmed.